# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

N° 09-cv-4095(JFB) (AKT)

SOUNDVIEW ASSOCIATES,

Plaintiff,

VERSUS

TOWN OF RIVERHEAD, ET AL.,

Defendants.

**MEMORANDUM AND ORDER**
September 28, 2012

JOSEPH F. BIANCO, District Judge:

On September 23, 2009, plaintiff Soundview Associates ("Soundview" or "plaintiff") brought this action against the Town of Riverhead (the "Town"), Richard Ehlers, and Dawn C. Thomas, alleging violations of Soundview's First Amendment right to petition the government for redress of grievances, its Fourteenth Amendment right to procedural due process, and its Fourteenth Amendment right to substantive due process.[1] Specifically plaintiff asserted that the defendants violated its constitutional rights, when, among other things,: (1) in 2003, defendants deprived Soundview – in an arbitrary and capricious manner – of the ability to build a health spa on a 191-acre site in Riverhead despite the existence of a 1982 Special Permit that allowed such construction; and (2) defendants wrongfully conditioned the processing of a separate application to construct a clubhouse on the property by another company on plaintiff's withdrawal of its continuing application with the Town of Riverhead for the health spa, as well as plaintiff's withdrawal of a pending state court action challenging the 2003 health spa decision. Soundview seeks compensatory and punitive damages and attorneys' fees pursuant to 42 U.S.C. § 1983 with respect to each claim.

The defendants now move for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, on the grounds

---

[1] Plaintiff also asserted violations of its Fifth Amendment rights to substantive and procedural due process, and asserted its claims against the Town Board, the Town Planning Department and John Does and/or Jane Does #1-6. By Memorandum and Order dated July 14, 2010, the Court dismissed plaintiff's Fifth Amendment claims and plaintiff's claims against the Town Board and the Town Planning Department. By a joint stipulation ordered by Magistrate Judge A. Kathleen Tomlinson on September 10, 2010, the John Does and/or Jane Does #1-6 were dismissed from this action.

that (1) plaintiff has not alleged or demonstrated harm from defendants' conduct, (2) plaintiff cannot succeed on its federal claims because plaintiff cannot demonstrate a federally protectable property right, (3) plaintiff cannot produce evidence of the conduct required for a substantive due process violation, and (4) defendants Ehlers and Thomas are protected by qualified immunity. Defendants seek dismissal of all of plaintiff's claims.

For the reasons set forth below, the Court grants defendants' motion in part and denies the motion in part. Specifically, the Court denies defendants' motion on the ground that plaintiff has not demonstrated injury. Plaintiff has alleged that its interest in the appeal of the Article 78 proceeding contesting the denial of its resort and spa permit request was adversely affected by the coercive conduct of the individual defendants, and this injury is sufficient to confer standing upon plaintiff.

However, the Court grants defendants' motion on the ground that plaintiff cannot demonstrate a federally protected property interest, and therefore plaintiff's substantive and procedural due process claims must be dismissed. It is undisputed that the 1982 Special Permit was contingent upon, among other things, (1) the submission of a site plan, and (2) the provisions of the Riverhead Town Code. The site plan submitted in conjunction with the 1982 Special Permit proposed a "health club" in the clustered three-hundred unit condominium development on the northern portion of the initial parcel. In 1983, plaintiff granted a scenic easement to the Town, which restricted a separate portion of the initial parcel, the golf course parcel, to golf course usage and other compatible recreational purposes. The scenic easement restricted the construction of residential structures beyond the approved 300 condominiums, and restricted the construction of non-residential structures. Nearly twenty years later, plaintiff submitted a special permit application for a 78,100 square foot "two story resort" with 48 rooms on the restricted golf course parcel. The Town denied plaintiff's application for several reasons, including that the land was restricted by the scenic easement. The Court concludes that the 1982 Special Permit did not create a federally protected property right to erect a resort and spa in 2002 on the golf course parcel because (1) the site plan submitted with the 1982 Special Permit proposed a health club within the condominium development and not on the golf course parcel; (2) the Riverhead Town Code required that the permit holder begin use and complete the construction or use requirements within one year and the health club was not constructed within the relevant time period; and (3) the golf course parcel was subsequently restricted by the scenic easement. The Court also concludes that, even apart from the 1982 Special Permit, the Town had discretion to deny the 2002 Application for the spa and resort under the Riverhead Town Code, which outlines the factors to consider when evaluating a special permit application, and the restrictions on the golf course parcel.

The Court also concludes that, even assuming *arguendo* that plaintiff had a protected property interest, plaintiff's substantive and procedural due process claims fail. With respect to plaintiff's substantive due process claim, plaintiff has not produced any evidence that the defendants arbitrarily or irrationally infringed upon a property interest in denying the 2002 Application. The Court concludes, based upon the undisputed facts, that the Town had legitimate interests which rationally could have been furthered by the denial of the application, including the preservation of the scenic easement, and no

rational jury could find otherwise (even construing the facts most favorably to plaintiff). With respect to plaintiff's procedural due process claim, plaintiff has not produced evidence that plaintiff was denied adequate process with respect to the submission of the 2002 Application, the hearings regarding the 2002 Application, or the denial of the 2002 Application. Plaintiff availed itself of an Article 78 proceeding with respect to the denial. Thus, plaintiff was afforded adequate due process with respect to the 2002 Application. To the extent plaintiff argues that defendants engaged in coercive conduct during the pendency of the appeal of the Article 78 proceeding, such claims form the basis of plaintiff's First Amendment claim, which cannot be re-cast as a due process claim.

With respect to plaintiff's First Amendment claim, defendants do not move for summary judgment on this claim, nor does defendants' motion clearly address the First Amendment claim in the context of qualified immunity. Thus, the Court denies defendants' motion for summary judgment on qualified immunity grounds without prejudice to defendants filing another motion for summary judgment on the First Amendment claim, including based on qualified immunity.

I. BACKGROUND

A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 statements of facts.[2]

Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[3]

1. The Property

Plaintiff's predecessors in interest are entities known as Baiting Hollow Development Corporation and Riverhead Flagg Corporation (collectively referred to here as "plaintiff"). (Defs.' 56.1 ¶ 1.) At some point prior to January 1982, plaintiff purchased a 191-acre parcel of land located in the Town of Riverhead, which bordered the Long Island Sound to the north, Oakleigh Avenue to the west, Sound Avenue to the south, and a privately owned farm, known as Wulforst Farm, to the east (the "initial parcel"). (*Id.* ¶ 2.) The initial parcel was improved with a clubhouse and a golf course located on the southern 140 acres of property (the "golf course parcel"). (*Id.*)

2. The 1982 Special Permit

On November 3, 1982, plaintiff obtained a special permit (the "1982 Special Permit") from the town for the initial parcel to construct a 300-unit residential condominium complex which included a tavern, restaurant, retail store, and health spa, subject to the requirements, restrictions

---

[2] At a conference on May 3, 2012, the Court directed the parties to filed revised Rule 56.1 statements of facts that specifically pointed to evidence in the record and fully explained any objection to an opposing party's statement of fact. All citations to the parties' 56.1 statements refer to the revised statements, submitted by the defendants on May 18, 2012 and by the plaintiff on May 22, 2012.

[3] In addition, although the parties' Rule 56.1 statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 statements, rather than the underlying citation to the record, when utilizing the 56.1 statements for purposes of this summary of facts.

and/or limitations of the Riverhead Town Code. (*Id.* ¶ 3.) Pursuant to the 1982 Special Permit, the town granted plaintiff permission to construct the residential condominium complex as a cluster along the bluffs overlooking the Long Island Sound. (*Id.* ¶ 4.) The 1982 Special Permit was conditioned on the plaintiff's agreement to execute covenants and restrictions preserving the open space and prohibiting further development on the golf course parcel. (*Id.* ¶ 5.) The 1982 Special Permit also required that plaintiff grant the town a scenic easement over the golf course parcel. (*Id.* ¶ 6.) The restrictions allowed for a golf club and golf course; golf club and golf course facilities including a restaurant, separate catering facilities and tavern; jogging, cycling and riding paths; retail stores specializing in golf, tennis and swimming equipment and apparel; and other compatible recreational uses. (Pl.'s 56.1 ¶¶ 5-6; Defs.'s Ex. F, Grant of Scenic Easement.)

The 1982 Special Permit was also subject to, among other things, the requirements, restrictions, and/or limitations of the Riverhead Town Code. (Defs.' 56.1 ¶ 7.) The 1982 Special Permit required the submission of a detailed site plan describing the specific development of the property and phases of construction proposed by the plaintiff. (*Id.* ¶ 8.) By Resolution Number 161 of 1983, the town approved the detailed site plans submitted by plaintiff's predecessor, which included the location of a health club facility on the northern part of the property. (*Id.* ¶ 9.) The health club facility was to be constructed in a relatively central location to the condominium complex. (Defs.' Ex. H, 1982 Special Permit Site Plan.)

According to the Riverhead Town Code in effect in 1982,

> Special permits of the Town Board shall be for whatever duration decided by the Town Board and as specified in the Town Board's resolution. If the Town Board fails to specify a period of time, said period shall be in perpetuity. In addition, the Town Board may condition the permit by requiring that the applicant actually begin use and complete the construction or use requirements in compliance with the conditions imposed by the Town Board within a time period of from one (1) to three (3) years, decided by the Town Board and set forth in the resolution granting said permit. If the Town Board fails to specify a period, said period shall be one (1) year.

(Defs.' 56.1 ¶ 12; Wilhelm Affidavit ¶ 4; Defs.' Ex. BB, Riverhead Code § 108-3.[4]) The 1982 Special Permit states that it was resolved that "Riverhead Flagg Corporation be granted a special permit to run with the land to construct a 300 unit condominium complex . . . subject to the requirements, restrictions, and/or limitations of the Riverhead Town Code, . . . ." (Pl.'s Ex. A, 1982 Special Permit.) The 1982 Special Permit does not specify a period for the

---

[4] Though plaintiff initially disputed the language of the Riverhead Code in effect at the relevant time, by letter dated August 17, 2012, plaintiff stated "[a]fter reviewing both § 108-133.2 of the Town Code which was enacted in 2002, as well as § 108-3(A) which was in effect in 1982 and is annexed as Exhibit BB to the defendant[s'] reply papers, the plaintiff hereby concedes that both provisions of the code, old and new, do in fact share generally the same language, in effect. Therefore, as to number 12 of the Defendants' Second Supplemental Statement Pursuant to Rule 56.1, there is no dispute as to the fact that this is what the code provides." (Pl.'s Letter, Aug. 17, 2012, ECF No. 48.)

4

plaintiff's predecessor to begin use and complete the construction or use requirements of the 1982 Special Permit. (*Id.*) The plaintiff or its predecessor never constructed the health club facility depicted on its site plan or any other health club facility or health spa.[5] (Defs.' 56.1 ¶ 13.)

3. The Scenic Easement

In April 1983, plaintiff and the town executed a grant of scenic easement which provided that

> 1. The use and development of the "Recreation and Open Space Preserve" will be forever restricted to some or all of the following:
>
> a. golf club and golf course open to public or private membership, as the case may be;
>
> b. golf club and golf course facilities including, but not limited to, restaurant, public or private, separate catering facilities and tavern;
>
> c. jogging paths, cycling paths, riding paths;
>
> d. retail stores specializing in golf, tennis and swimming equipment and apparel, limited to not more than one of each store;
>
> e. any other compatible recreational uses.

(Defs.' Ex. F, Grant of Scenic Easement.[6]) The grant also included some restrictions. (*Id.*) Among other things, the restrictions stated that "except to the extent specifically required or used for or in aid of the . . . permitted uses . . . no residential structures, the approved condominium units notwithstanding, shall be erected" and "no temporary or permanent non-residential structures . . . shall be placed or erected thereon." (*Id.*)

The scenic easement states that the agreement between plaintiff and the Town to grant the easement is pursuant to New York General Municipal Law § 247, which authorizes the acquisition of interests or rights for the preservation of open spaces. (*Id.*; *see also* N.Y. Gen. Mun. Law § 247.) According to Ehlers' declaration, pursuant to New York General Municipal Law § 247, plaintiff was afforded real property tax reductions on the value of the golf course parcel. (Ehlers Decl. ¶ 13.)

4. Development of the Property

Defendant Ehlers contends that, prior to 2002, plaintiff or its predecessor constructed, or sold the rights to construct, three-hundred condominium units pursuant to the plans it submitted. (Ehlers Decl. ¶ 18.) All of the permitted residential yield on the

---

[5] Plaintiff states that this fact is in dispute because "[t]he defendants never processed the plaintiff's site plan application for the health spa and denied its superfluous second special permit application" and cites the resolution denying the application in 2003. (Pl.'s 56.1 Counter Statement ¶ 13.) Plaintiff does not submit evidence to dispute defendants' statement of fact, and in its attempt to place blame on defendants, implicitly agrees that the spa was not built. The declaration of Neil Rego ("Rego"), a partner of Soundview, explicitly admits this fact; he states "Soundview's predecessors in interest proceeded with development of and conveyance of the condominiums, but did not, at the time, obtain site plan approval for nor construct the health spa." (Rego Declaration ("Rego Decl.") ¶ 10.)

[6] Although Rego's declaration states that the grant of the Scenic Easement occurred April 19, 1984, it is clear from the face of the document that the grant occurred in April 1983, and it was recorded by the Clerk of Suffolk County on April 13, 1983. (Defs.' Ex. F, Grant of Scenic Easement.)

5

initial parcel was clustered in the three-hundred unit residential condominium complex along the bluffs overlooking the Long Island Sound. (*Id.*)

Both parties agree that plaintiff itself constructed 126 units. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48; Defs.' Letter at 3, Sept. 21, 2012, ECF No. 50; Defs.' Ex. LL, Planning Board Letter.) According to the deposition testimony of Pasquale Intrieri, Rego's partner, plaintiff sold the rights to construct the remaining 174 units to another entity called High Orchard.[7] (Defs.' Ex. NN, Intrieri Deposition Transcript ("Intrieri Dep.") at 20-21; Pl.'s Ex. S, Intrieri Dep. at 92.) The parties agree that, at some point, the maximum number of units permitted was reduced by agreement to 270 units. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48; Defs.' Letter at 2, Sept. 21, 2012, ECF No. 50.) According to a planning board letter to counsel for "The Knolls at Fox Hill, Inc.", an entity constructing residential units, 250 of the 270 permitted units had been constructed by January 5, 2001, and the planning board approved six additional units at that time. (Defs.' Ex. LL, Planning Board Letter.) With respect to this issue, plaintiff submitted a document which states that only 216 units had been constructed at this time. (Pl.'s Suppl. Ex. B, Key Map Excerpt.) Defendants contend that this document was based on a survey of the land as it existed in 1995, and that the planning board's calculation is the correct assessment as to the number of units constructed in 2002. (Defs.' Letter at 3, Sept. 21, 2012, ECF No. 50.)

Prior to 2002, the golf course parcel was divided out of the initial parcel.[8] (Defs.' 56.1 ¶ 14.) In or about 1996, the plaintiff leased the golf course parcel to Rugby Recreational Group, LLC ("Rugby"). (*Id.* ¶ 15.) Under the terms of the lease between the plaintiff and Rugby, Rugby held an option to purchase the golf course parcel for ten million dollars. (*Id.*) According to Rego's declaration, the lease reserved for Soundview a seven acre parcel which was not operationally part of the golf course but was subject to the recreational use easement, for the purpose of developing and constructing Soundview's health spa. (Rego Decl. ¶ 15.) The golf course parcel had never had frontage along the Long Island Sound or any other body of water. (Defs.' 56.1 ¶ 16.)

5. The 2002 Application

In 2002, the plaintiff applied to the town for a special permit (the "2002 Application") to construct a forty-eight unit residential development complex with a spa on the golf course parcel. (*Id.* ¶ 17.) According to the 2002 Application site plan, the spa and resort was to total 78,100 square feet. (Defs.' Ex. L, 2002 Application Site Plan.) The 2002 Application sought approval to construct the complex on an open unimproved portion of the golf course parcel.[9] (Defs.' 56.1 ¶ 20.) An electric

---

[7] Plaintiff does not present any other evidence as to the exact number of units plaintiff sold the rights to construct. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48.)

[8] Plaintiff "objects to this statement as it is incomprehensible." (Pl.'s 56.1 Counter Statement ¶ 14.) The Court finds that this statement is comprehensible, and, as plaintiff does not point to evidence to contradict this fact, admitted by plaintiff.

[9] Plaintiff states that this fact is "in dispute" and, without any further explanation, cites to various pages of the deposition transcript of Pasquale Intrieri. (Pl.'s 56.1 Counter Statement ¶ 20.) The cited deposition testimony does not clearly indicate what aspects of this statement are disputed though Intrieri states that the spa parcel had "several old buildings on it" and "wasn't part of the open space." (Pl.'s Ex. S, Intrieri Dep. at 232, 236). To the extent this

easement burdens the southwest corner of the golf course parcel and runs through the open space where the 2002 Application proposed to construct the 48 unit complex. (*Id.* ¶ 18.) Pursuant to Riverhead Town Code Section 108-125 in effect at the time of the application, the recreational use zoning district required all lots to have 500 feet of frontage along the Long Island Sound or other body of water. (*Id.* ¶ 19.)

By resolution, the Riverhead Town Board denied the special permit application on November 18, 2003. (*Id.* ¶ 21.) In the resolution denying the 2002 Application, the Town Board found, among other things, that the site was not suitable for the proposed development as it was "encumbered by covenants and restrictions . . . intended to restrict the allowable uses of the property and do not allow the construction of a health spa."[10] (Defs.' Ex. N, Town Board Resolution.)

On March 18, 2004, plaintiff commenced an Article 78 proceeding in New York State Supreme Court, Suffolk County. (Defs.' 56.1 ¶ 22.) According to the Rego declaration, on or about September 20, 2004, the state court partially denied the town's motion to dismiss and recognized that the evidence submitted did not negate or exclude a health spa as part of the definition of "other compatible recreational uses." (Rego Decl. ¶¶ 28-29.) Rego states that, on or about February 2, 2005, the town filed a motion to renew its motion to dismiss contending that since the partial denial of its motion to dismiss, the town implemented a comprehensive plan which re-zoned the property as residential. (*Id.* ¶ 30.) By decision dated April 19, 2005, the New York State Supreme Court dismissed the proceeding. (Defs.' 56.1 ¶ 23.)

6. The 2005 Applications

On or about June 15, 2005, Wulforst Farms, LLC ("Wulforst") purchased a privately owned farm, known as Wulforst Farm, directly east of the golf course parcel, consisting of approximately 40 acres (the "Wulforst parcel"). (Defs.' ¶ 25.) According to Rego's declaration, Wulforst was a sister company to Rugby. (Rego Decl. ¶ 36.) On or about November 18, 2005, the plaintiff and Wulforst jointly filed applications with the town (the "2005 Applications") to, among other things: (1) modify the boundary lines of the respective properties so as to subtract ten acres from the Wulforst parcel and add it to the golf course parcel; (2) subdivide the remaining thirty acres of the Wulforst parcel into a thirty lot clustered subdivision development; and (3) construct a new multi-million dollar clubhouse on the golf course parcel, to be known as the Baiting Hollow Club. (Defs.' 56.1 ¶ 26.) The 2005 Applications did not mention the forty-eight unit, 78,100 square foot, residential spa complex that was the subject of the 2002 Application.[11] (*Id.* ¶ 28.)

---

testimony seeks to establish that there were old buildings on the spa parcel at some point, this fact is not dispositive to this motion. To the extent plaintiff seeks to argue that the spa parcel was not subject to the scenic easement, plaintiff itself rejects that argument in its papers and in the Rego declaration.

[10] The Town Board also found that (1) adequate provisions have not been made for the collection and disposal of solid wastes, (2) because land had been set aside for agricultural use or recreational turf, the land cannot be used for Suffolk County density calculations and prior applications for development maximized the allowable sewage flow, (3) the disadvantages of the intense development outweighed the advantages to be gained, and (4) the intense sewage flows that would be generated from the property would adversely affect the health, safety, and welfare of the community at large. (Defs.' Ex N., Town Board Resolution.)

[11] Plaintiff objects to this statement because it "attempts to portray that Rugby/Wolforst's 2005 applications were submitted jointly with the plaintiff which is not the case." (Pl.'s 56.1 Pl.'s 56.1 Counter

On April 25, 2006, plaintiff filed a notice of appeal of the decision dismissing the Article 78 proceeding. (*Id.*¶ 24.) On or about October 23, 2006, plaintiff perfected its appeal of the decision dismissing the Article 78 proceeding. (*Id.* ¶ 31.) In or about October of 2006, defendants learned that plaintiff and Wulforst intended to pursue both the 2002 Application as well as the Baiting Hollow Club on the golf course parcel. (*Id.* ¶ 30.)

According to Ehlers, Riverhead's Town Attorney, and Thomas, Riverhead's Planning Board Attorney, they informed plaintiff's counsel that the two projects were related because they were proposed on the same property and the 2005 Applications would need to be amended to include the 2002 Application so the town could study the cumulative impacts of both projects as required by New York's State Environmental Quality Review Act ("SEQRA"). (Ehlers Declaration ("Ehlers Decl.") ¶ 30; Thomas Declaration ("Thomas Decl.") p. 6 ¶ 27.[12])

According to the deposition testimony of Barry Beil ("Beil"), a principal of Rugby/Wulforst, town officials told Beil that the Rugby/Wulforst applications would be processed expeditiously if the Soundview lawsuit "went away." (Pl.'s Ex. J, Beil Deposition Transcript ("Beil Dep.") at 219.) According to Beil, he was informed at a meeting that Thomas did not want to deal with the Soundview appeal. (*Id.* at 235.) According to Beil, Thomas informed him that she was convinced that Soundview's appeal had no merit, but that she had a busy week and until the lawsuit was resolved, "the issues relating to the application were still not going to move forward and so the way to move the application forward was for us to take care of this appeal." (*Id.* 236.)

Stanley Pine ("Pine"), another principal of Rugby/Wulforst, testified that

> [Thomas] was going to have to answer an appeal or some kind of papers that Neil Rego had made application or lawsuit or – and Dawn Thomas came to Barry Beil and I and requested, insisted – Ms. Thomas was – I'm not sure the right term to use, but wanted us to entice or induce Mr. Rego to relinquish his application and interest in building this. I think she had to put in an answer to an appeal or something of that nature and she was about to have to put in an answer and she, instead of putting in the answer, turned up the heat on Mr. Beil and myself to induce Mr. Rego to drop his application or his appeal or interest in that spa.

(Pl.'s Ex. J, Pine Deposition Transcript ("Pine Dep.") at 47-48.) According to Pine, "we couldn't get our project moved forward unless we assisted in having [Rego] relinquish his application for a spa." (*Id.* at 105.)

According to Thomas' and Ehlers' declarations, at a meeting on or about November 29, 2006, Beil informed the defendants that he was purchasing the golf course parcel and did not plan on pursuing the 2002 Application. (Ehlers Decl. ¶ 31; Thomas Decl. ¶ 28.) Beil stated that he did

---

Statement ¶ 28.) The Court notes that plaintiff admits that the applications were submitted jointly in paragraph 26. Plaintiff's evidence with respect to paragraph 28 does not demonstrate that the applications were not submitted jointly; rather, it obliquely references separate applications. Where plaintiff posits this objection, the Court deems the statement admitted. In any event, this fact is not dispositive for the motion.

[12] The Court notes that Thomas' declaration contains two paragraphs numbered 27, and therefore the Court provides the page number for the cited paragraph.

8

not wish to amend the 2005 Applications. (*Id.*)

On January 29, 2007, plaintiff withdrew its appeal of the state Article 78 proceeding. (Defs.' 56.1 ¶ 39.) On or about January 16, 2008, plaintiff consummated its transaction with Rugby by selling the golf course parcel for the full contract price of ten million dollars.[13] (*Id.* ¶ 41.) In consideration for withdrawing the appeal of the state Article 78 proceeding and the 2002 Application, Wulforst and/or Rugby granted the plaintiff the right to collect rents from the original clubhouse for an additional one hundred ninety-eight years and granted two of the partners of the plaintiff two-year extensions on their personal consulting agreements with Rugby. (*Id.* ¶¶ 43-44.)

B. Procedural Background

Plaintiff filed the complaint in this action on September 23, 2009. On February 8, 2010, defendants filed a motion to dismiss the complaint. On July 14, 2010, the Court issued a Memorandum and Order granting in part and denying in part defendants' motion to dismiss the complaint. Defendants moved for summary judgment on November 28, 2011. Plaintiff submitted its opposition on January 17, 2012. Defendants submitted their reply on February 21, 2012. The Court held oral argument on April 4, 2012. At a conference held on May 3, 2012, the Court directed the parties to submit revised statements pursuant to Local Rule 56.1 that fully complied with the requirements of that rule. Defendants submitted revised 56.1 statements on May 16, 2012 and May 18, 2012. The plaintiff submitted a revised 56.1 counterstatement on May 22, 2012. On August 8, 2012, the court held a conference to address the issues of (1) the number of units constructed on the initial parcel, and (2) the relevant town code provisions. Plaintiff submitted a letter on these issues on August 17, 2012. Defendant responded on September 21, 2012. The Court has fully considered the submissions of the parties.

II. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct.

---

[13] According to Rego's deposition testimony, Rugby had an obligation to exercise its option to purchase the golf course parcel even if the town denied the 2005 Applications. (Defs.' Ex. Y, Rego Deposition Transcript at 238-39.)

9

2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

III. DISCUSSION

A. Standing

As the Second Circuit has explained, "Article III of the Constitution limits the judicial power of the United States to the resolution of cases and controversies. This limitation is effectuated through the requirement of standing." *Cooper v. U.S. Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009) (citing U.S. Const. art. III, § 2 and *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 471-72, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)), *cert denied sub nom Sincerely Yours, Inc. v. Cooper*, 130 S.Ct. 1688 (2010). "It is axiomatic that '[t]here are three Article III standing requirements: (1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision.'" *Id.* (quoting *Kendall v. Employees Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009)); *see also Lamar Adver. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 373 (2d Cir. 2004) ("To meet Article III's constitutional requirements for standing, a plaintiff must allege an actual or threatened injury to himself that is fairly traceable to the allegedly unlawful conduct of the defendant." (internal quotation marks omitted)).

To meet Article III's injury-in-fact requirement, plaintiff's alleged injury "must be 'concrete and particularized' as well as 'actual or imminent, not conjectural or hypothetical.'" *Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003) (additional quotation marks omitted) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)); *see, e.g.*, *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (finding that

plaintiffs had adequately articulated Article III injury by alleging that they have paid higher tolls as a result of defendant's policy). Furthermore, the alleged injury must "affect[ ] the plaintiff in a personal and individual way to confirm that the plaintiff has a personal stake in the controversy and avoid having the federal courts serve as merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding." *Baur*, 352 F.3d at 632 (internal quotation marks and citations omitted).

Defendants argue that plaintiff lacks standing because plaintiff cannot demonstrate that it suffered an injury, and even if an injury exists, plaintiff cannot trace that injury to the defendants' conduct. (Defs.' Mem. of Law, at 10-11.) Defendants argue that Rugby was required to close on the purchase of the golf course parcel, and plaintiff and its principals were compensated for the plaintiff's inability to construct and operate a spa on the property. (*Id.* at 10-11.) Plaintiff argues that, but for the conduct of defendants, plaintiff would have been able to sell the golf course parcel and operate the spa. (Pl.'s Opp. at 28.) Construing the evidence most favorably to plaintiff, the Court agrees that plaintiff has produced evidence of injury with respect to its inability to construct and operate the spa, for purposes of establishing standing. For this reason, defendants' motion for summary judgment on this ground is denied.[14]

---

[14] To the extent defendants argue that plaintiff cannot establish a causal nexus between defendants' alleged conduct and the plaintiff's alleged injury because plaintiff's contract was with Rugby and the 2002 and 2005 Applications dealt with Wulforst (Defs.' Br. at 11), plaintiff has produced evidence that defendants' conduct caused the withdrawal of the spa application.

## B. Section 1983

Plaintiff asserts three claims pursuant to § 1983. Specifically, plaintiff alleges: (1) a substantive due process claim under the Fourteenth Amendment; (2) a procedural due process claim under the Fourteenth Amendment; and (3) violations of the First Amendment right to petition the government for the redress of grievances. The Court addresses each of these claims in turn.

To prevail on a claim under § 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws; (2) by a person acting under the color of state law. 42 U.S.C. § 1983.[15] "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979).

---

[15] Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

1. Substantive Due Process Claim

Plaintiff brings a substantive due process claim, alleging that it was coerced into withdrawing its appeal of the Article 78 proceeding and its special permit and site plan applications due to the Town's threatened refusal to process Rugby's permit applications. The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005). Instead, the scope of substantive due process is very limited. *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Supreme Court has said that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992). Substantive due process is a means of "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974). "In order to establish a violation of a right to substantive due process, [after plaintiff demonstrates that it was denied a valid property interest,] a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." *Rosa R. v. Connelly*, 889 F.2d 435, 439 (2d Cir. 1989). For the reasons set forth below, the Court concludes that plaintiff has adequately stated a substantive due process claim under § 1983.

a. Property Interest

To meet the first prong of the test for substantive due process violations, a plaintiff must show that he has a "valid property interest." *Cine SK8 v. Town of Henrietta*, 507 F.3d 778, 784 (2d Cir. 2007) (citing *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)); *see also Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) ("To formulate a claim under the Due Process Clause of the Fourteenth Amendment, a plaintiff must demonstrate that he or she possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him or her of that interest.").

"It is well settled in this Circuit that a constitutionally protected property interest in land use regulation arises only if there is an entitlement to the relief sought by the property owner." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994). A plaintiff has a "legitimate claim of entitlement" to a particular benefit if, "absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the benefit would have been granted." *RRI Realty Corp. v. Incorp. Vill. of Southampton*, 870 F.2d 911, 917 (2d Cir. 1989) (citation and internal quotations omitted). An entitlement to a benefit arises under the "strong likelihood" aspect of this analysis "only when the discretion of the issuing agency is so narrowly circumscribed" as to virtually assure conferral of the benefit. *Id.* at 918.

When a permit has already been granted, "the 'clear entitlement' test no longer [is] applicable to the special permit because the test applies only to permits being sought. The special permit, once issued,

unquestionably [is] the property of [the recipient]." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379 (2d Cir. 1995); *T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 461 (E.D.N.Y. 2002).

"The issue of whether an individual has such a property interest is a question of law '[s]ince the entitlement analysis focuses on the degree of official discretion and not on the probability of its favorable exercise.'" *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192 (2d Cir. 1994) (citing *RRI Realty Corp.*, 970 F.2d at 918).

Defendants argue that plaintiff does not have a federally protected property interest because (1) the 1982 Special Permit did not create a right to the proposed spa and resort, (2) the scenic easement granted to the Town after the 1982 Special Permit restricted the golf course parcel and the proposed spa and resort were incompatible with the scenic easement, (3) plaintiff had no right to build the additional units contemplated in the 2002 Application because plaintiff had constructed, or sold the rights to construct, the units contemplated by the 1982 Special Permit, (4) by the terms of the 1982 Special Permit and the relevant Riverhead Town code provisions, any rights to construct a spa or health club had been abandoned, (5) the property did not include the required 500 feet of frontage on the Long Island Sound, and (6) an electric easement burdened the golf course parcel in the area where the plaintiff sought to build the spa and resort.[16]

(Defs.' Br. at 12-15.) Plaintiff contends that, because the 1982 Special Permit had been granted, the plaintiff had a protected property interest. (Pl.'s Br. at 5.)

i. The 1982 Special Permit

The Court does not agree that the issuance of the 1982 Special Permit automatically conferred upon plaintiff the right to build a 78,100 square foot "two story resort with 48 rooms" on the golf course parcel. (Defs.' Ex. L, 2002 Application Site Plan.) First, the 1982 Special Permit was contingent on site plan approval, and the extremely detailed site plan submitted to, and approved by, the Town for the 1982 Special Permit placed the "health club" within the condominium complex on the northern portion of the initial parcel, and not on the golf course portion of the parcel. The site plan submitted with the 1982 Special Permit clearly did not contemplate the spa and resort proposed by plaintiff nearly twenty years later.

Second, the Town Code provided that the "Town Board may condition the permit by requiring that the applicant actually begin use and complete the construction or use requirements in compliance with the conditions imposed by the Town Board within a time period of from one (1) to three (3) years, decided by the Town Board and set forth in the resolution granting said permit. If the Town Board fails to specify a period, said period shall be one (1) year." (Wilhelm Affidavit ¶ 4; Defs.' Ex. BB, Riverhead Code.) Here, the Town Board did not specify a period for use and completion; thus, the relevant time period for these events was one year. Plaintiff's predecessor did not construct the health spa

---

[16] Defendants also argue that plaintiff does not have a property interest because the Riverhead Town Code currently prohibits spas in the zoning district where the property is located. (Defs.' Br. at 13.) Plaintiff argues that defendants engaged in dilatory conduct during the Article 78 proceeding in order to re-zone the property, and therefore the "special facts" exception applies. (Pl.'s Br. at 6-11.) In light of the Court's analysis *infra*, which concludes as a matter of law that the plaintiff did not possess a federally

protected property right prior to the re-zoning, the Court does not address these arguments.

contemplated in the 1982 Special Permit and site plan within that time frame.[17]

Finally, and perhaps most critically, after the issuance of the 1982 Special Permit, plaintiff granted the Town a scenic easement restricting the parcel upon which the spa and resort was eventually proposed. Even assuming *arguendo* that the 1982 Special Permit created a right in 1983 to construct a spa and resort like the one eventually proposed in 2002, plaintiff voluntarily restricted the golf course parcel after the issuance of the Special Permit. A property owner is not entitled to ignore voluntary restrictions of its property simply because certain rights existed at a previous point in time.

The instant case is dissimilar from the cases cited by plaintiff, both of which were decisions on a defendant's motion to dismiss. (Pl.'s Br. at 5-6.) In both cases, the plaintiffs alleged that they had received permits from the town or state, and later, ministerial permits from the towns were required in order for the plaintiffs to exercise their rights under the primary permits. *See T.S. Haulers, Inc. v. Town of Riverhead*, 190 F. Supp. 2d 455, 461-62 (E.D.N.Y. 2002); *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 377-79 (2d Cir. 1995). Though this Court relied on these opinions in the motion to dismiss opinion in this case, given the extensive factual record before the Court at present, the Court finds that these cases are inapplicable.[18] Based on the record before the Court, including the provisions of the 1982 Special Permit and the related site plan, the subsequent development of the parcel, and plaintiff's grant of the scenic easement on the golf course parcel, it is clear from the uncontroverted facts that the 2002 Application, submitted nearly twenty years after the 1982 Special Permit, was not a mere request for ministerial action by the Town.

ii. No Claim of Entitlement to the Resort and Spa

Even though the Court has determined that the 1982 Special Permit did not create a federally protected right to construct the resort and spa in 2002, the Court must still determine whether plaintiff possessed a "legitimate claim of entitlement" to construct the resort and spa on the golf course parcel. As noted *supra*, an entitlement to a benefit arises where there is "a certainty or a very strong likelihood that the benefit would have been granted." *RRI Realty Corp.*, 870 F.2d at 917. A strong likelihood exists "only when the discretion of the issuing agency is so narrowly circumscribed" as to virtually assure conferral of the benefit. *Id.* at 918.

---

[17] Defendants also argue, both in their briefs and supplemental submissions, that plaintiff had no right to construct the 48 additional units as part of the proposed resort and spa because at the time of the application, plaintiff had constructed or sold the rights to construct the initially-approved 300 condominium units (which were at some point reduced to 270 units) allowable under the 1982 Special Permit. The arguments regarding the provisions of the Riverhead Town Code requiring construction and use of the special permit within one year would also apply to the condominiums. The Court does not reach this argument.

[18] As the court stated in *T.S. Haulers, Inc.*, "[t]he Court notes that later in the litigation it may become clear that the Town does exercise discretion when determining whether to issue a special permit to sand mine. But, at this early stage in the litigation, without the benefit of detailed information regarding Town Code provisions or other regulations that govern the issuance of a special permit and the operation of the Town Board, the Court finds that the amended complaint describes an absence of discretion sufficient to defeat a motion to dismiss the substantive due process claim." 190 F. Supp. 2d at 462.

As noted by the Second Circuit in *Harlen Associates v. Incorporated Village of Mineola*, "[u]nder New York law, the Board has the power to grant and deny special use permits within its 'untrammeled, but of course not capricious discretion . . . with which courts may interfere only when it is clear that the Board has acted solely upon grounds which as a matter of law may not control.'" 273 F.3d 494, 504 (2d Cir. 2001) (quoting *Retail Prop. Trust v. Bd. of Zoning Appeals of Hempstead*, 281 A.D.2d 549, 722 N.Y.S. 244, 246 (N.Y. App. Div. 2001)). Under the Riverhead Town Code, the Town Board and the Planning Board may consider a number of different factors when evaluating a special permit application, including whether the site is suitable for the use, whether adequate provisions have been made for sewage, and whether the intensity of the proposed specially permitted use is justified. Riverhead Town Code § 108-133.5.; *see also Harlen Assocs.*, 273 F.3d at 504 ("Although Village law requires that the Board consider certain standards, the ultimate decision as to whether to grant a special use permit conclusively lies with the Board."). In addition, under the Riverhead Town Code, the Town may consider a number of factors when evaluating a site plan. Riverhead Town Code §§ 108-128 through 108-133.

It is undisputed that plaintiff sought to construct a 78,100 square foot resort and spa on a parcel of land that was encumbered by a scenic easement restricting the land to "open space and preserve."[19] The easement's restrictions barred, among other things, "temporary or permanent non-residential structures" and "residential structures" apart from those approved by the 1982 Special Permit or used in aid of the permitted uses. (Defs.' Ex. F, Grant of Scenic Easement.) Other portions of the easement restricted the property to use of a golf course, golf course facilities including a restaurant and tavern, retail stores specializing in golf, tennis and swimming apparel, and "any other compatible recreational use." (*Id.*)

Plaintiff argues that the Riverhead Town Code's definition of "recreational center" includes "health spas" and that it permits "health spas and health related facilities" in a "Planned Recreational Park" and therefore the proposed resort and spa was permissible under the easement. (Pl.'s Opp. at 7.[20]) As the Second Circuit has noted, however, "even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected interest." *Clubside Inc. v. Valentin*, 468 F.3d 144, 153 (2d Cir. 2006) (quoting *RRI Realty Corp.*, 870 F.2d at 153). Although plaintiff disagrees with the Town's decision and classifies it as unreasonable, arbitrary, and incorrect, plaintiff does not argue that the Town lacked discretion to make this decision.[21] (Pl.'s Br.

---

[19] In addition, an electric easement burdens the southwest corner of the golf course parcel and runs through the open space where the 2002 Application proposed to construct the 48 unit complex. (Defs.' 56.1 ¶ 18.)

[20] Plaintiff has not submitted the cited portions of the Riverhead Town Code as part of the record. The Court assumes, for the purposes of this decision, that plaintiff has correctly cited the code.

[21] To the extent plaintiff's argument could be interpreted to be an argument that once plaintiff complied with the application process, the special permit should have automatically issued, the Second Circuit has clearly rejected this argument in *Harlen Associations*:

> [Plaintiff] argues that this broad discretion is rendered nugatory because it filed a valid application for the special use permit. It contends that once a valid application is filed, the Board must grant the permit subject only to the imposition of reasonable conditions. This argument is untenable. It

at 7.) The appropriate inquiry focuses on "the degree of official discretion and not on the probability of its favorable exercise." *Clubside, Inc.*, 468 F.3d at 154 (quoting *RRI Realty*, 870 F.2d at 918). It is readily apparent that the Town had considerable discretion in deciding the 2002 Application by virtue of the Riverhead Town Code and the provisions of the Scenic Easement.[22]

Because there is no federally protected property right at issue in this case, the Court grants defendants' motion for summary judgment with respect to plaintiff's substantive due process claim.[23]

### b. Arbitrary or Irrational Infringement on Property Interest

Even assuming *arguendo* that plaintiff possessed a property right, plaintiff still cannot satisfy the second prong of its substantive due process claim. In order to meet the second prong of a substantive due process claim, plaintiff must show "that defendants infringed on [its] property right in an arbitrary or irrational manner." *Cine SK8*, 507 F.3d at 784. In particular, plaintiff must show that the government's infringement was "'arbitrary,' 'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" *Ferran v. Town of Nassau*, 471 F.3d 363, 369-70 (2d Cir. 2006) (quoting *Lowrance v. C.O. S. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994); *see also Harlen Assocs.*, 273 F.3d at 505 ("As we have held numerous times, substantive due process 'does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit. . . . [Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.'" (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)); *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996)

---

would make the Board nothing more than a rubber stamp and reduce its role in the process to a rote check of whether the proper filings had been made. Such a result is diametrically opposed to the intent of the Village in drafting its zoning law to give the Board discretion and the duty to protect the interests of the community.

273 F.3d at 504. Thus, any such argument is without merit.

[22] To the extent plaintiff attempts to argue that, because the plaintiff's Article 78 proceeding withstood an initial motion to dismiss, this somehow demonstrates that the plaintiff possessed a property interest, the Second Circuit has held that even when an Article 78 court "has ordered a town board to grant a particular application after it concluded that the board acted arbitrarily in denying the application[, this] does not necessarily mean that the applicant had a property interest in the permit prior to the Article 78 proceeding." *Clubside, Inc.*, 468 F.3d at 157 (collecting cases). The proper inquiry is the Town's discretion, and the state court's decision on the motion to dismiss (which was not provided to the Court) does not affect this inquiry in the instant case.

[23] Plaintiff also alleges in its opposition that it had a property right in its subsequent civil action regarding the 2002 Application. (Pl.'s Opp. at 20.) "The Supreme Court has made it clear that a substantive due process claim may not be maintained when a specific constitutional provision . . . protects the right allegedly violated." *McCann v. Mangialardi*, 337 F.3d 782, 786 (7th Cir. 2003). "Despite recasting [its] claim within the context of a liberty interest protected by the due process clause of the Fourteenth Amendment, [plaintiff's] claim remains, in essence, a First Amendment claim. The due process clause is not an appropriate means to address a First Amendment issue." *Galibois v. Fisher*, No. 04-cv-444-JD, 2007 WL 1246452, at *4 (D.N.H. Apr. 27, 2007) (citing *Pagan v. Calderon*, 448 F.3d 16, 33 (1st Cir. 2006); *Canady v. Bossier Parish Sch. Bd.*, 240 F.3d 437, 444 (5th Cir. 2001)); *see also Logan v. Lockett*, No. 07-1759, 2009 WL 799749, at * (W.D. Pa. Mar. 25, 2009) ("Thus, plaintiff's claim arises, if at all, under the First Amendment, and he cannot recast his claim as one involving a deprivation of due process."). The Court finds that plaintiff's claim with respect to its rights, and defendants' conduct, in the state court civil action properly falls under its First Amendment claim and cannot be asserted under substantive due process.

(explaining that plaintiff meets second prong of substantive due process test "only when government acts with no legitimate reason for its decision" (citation and quotation marks omitted)).

Specifically, "[i]n the zoning context, a government decision regulating a landowner's use of his property offends substantive due process if the government action is arbitrary or irrational. Government regulation of a landowner's use of his property is deemed arbitrary or irrational, and thus violates his right to substantive due process, only when government acts with no legitimate reason for its decision." *Southview Assoc., Ltd. v. Bongartz*, 980 F.2d 84, 102 (2d Cir. 1992) (citations and quotation marks omitted); *see also Merry Charters, LLC v. Town of Stonington*, 342 F. Supp. 2d 69, 78 (D. Conn. 2004) (explaining that "denial by a local zoning authority violates substantive due process standards only if the denial 'is so outrageously arbitrary as to constitute a gross abuse of governmental authority" (quoting *Natale*, 170 F.3d at 263)). For instance, in the context of a substantive due process claim against the Town of Colchester where zoning was at issue, the Second Circuit reversed a grant of summary judgment to the Town where, *inter alia*, it "had no authority under state law" to take certain actions with respect to plaintiffs' "protected property interest in the use of their property." *Brady v. Town of Colchester*, 863 F.2d 205, 215-16 (2d Cir. 1988). The Second Circuit explained that under these extreme circumstances, a "trier of fact could conclude that there was no rational basis for the [Town's zoning board's] actions, and that, as a result, the [zoning board] violated appellants' rights to substantive due process." *Id.* at 216 (citation and quotation marks omitted).

The Court concludes that, even if plaintiff could establish a cognizable property right, plaintiff cannot satisfy the second prong of the due process inquiry. Where a board has legitimate interests which could rationally be furthered through the denial of an application, a board's actions cannot be held to be arbitrary as a matter of federal constitutional law. *See Harlen Assocs.*, 273 F.3d 494, 505 (2d Cir. 2001) ("[Plaintiff] also fails to satisfy the second part of the due process inquiry, since it is evident that, even if it had a cognizable property right, the Board did not deprive it of any such right in an arbitrary manner. As we concluded in the context of [plaintiff]'s equal protection claim, the Board had legitimate interests which could rationally be furthered through the denial of [plaintiff]'s application. As a result, the Board's actions cannot be held to be arbitrary as a matter of federal constitutional law." (citation omitted)). The board specified several reasons for the denial of the 2002 Application, including the legitimate interests of preserving the scenic easement, provisions for solid wastes, density regulations, sewage concerns, and the costs of the intense development. (Defs.' Ex. N, Town Board Resolution.) Given the uncontroverted facts, no rational jury could find the Town's conduct to be arbitrary or irrational. *See Crowley v. Courville*, 76 F.3d 47, 53 (2d Cir. 1996) ("We note, however, that such a ruling may be made only when government acts with no legitimate reason for its decision, and that the Village authorities certainly had legitimate reasons for their refusal to allow [plaintiff] to apply the 1975 Variance to his proposed retail development more than a decade after the variance was granted." (internal quotation marks and citations omitted)).

Plaintiff does not point to any evidence that could show that the Town's decision to deny the 2002 Application was "'arbitrary,'

17

'conscience shocking,' or 'oppressive in the constitutional sense,' not merely 'incorrect or ill-advised.'" *Ferran*, 471 F.3d at 369-70. Instead, plaintiff exclusively points to conduct with respect to the subsequent appeal of the denial of the 2002 Application. (*See* Pl.'s Opp. at 11-20.) As noted *supra* note 23, the allegations and evidence regarding defendants' conduct with respect to the subsequent litigation are properly raised in a First Amendment claim, not a due process claim.

Thus, the Court determines in the alternative that, even if plaintiff possessed a protected property right, no rational jury could find that the denial of the 2002 Application was an arbitrary or irrational infringement upon that interest.

\*   \*   \*

For the foregoing reasons, summary judgment is granted with respect to plaintiff's substantive due process claim.

2. Procedural Due Process Claim

In order to assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [government] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). In order to establish a procedural due process violation, a plaintiff must prove that he or she was deprived of "an opportunity . . . granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971) (citations and internal quotation marks omitted).

As discussed extensively *supra*, plaintiff does not possess a federally protected property right, and thus plaintiff's procedural due process claim must fail. *See Puckett v. City of Glen Cove*, 631 F. Supp. 2d 226 (E.D.N.Y. 2009) ("To demonstrate a violation of due process rights based upon a zoning decision, whether procedural or substantive, a plaintiff must first demonstrate the possession of a federally protected property right to the relief sought.").

In addition, plaintiff has not alleged or produced evidence that it was denied adequate process in connection with the submission of the 2002 Application, the hearings on the 2002 Application, or the denial of the 2002 Application. Plaintiff had access to, and availed itself of, an Article 78 proceeding. *See Deperno v. Town of Verona*, No. 6:10-CV-450(NAM/GHL), 2011 WL 4499293, at \*7 (N.D.N.Y. Sept. 27, 2011) ("In this case, the availability of Article 78 administrative review of the ZBA's determination and procedural process under state law, including the enactment of the zoning law, precludes a finding that the defendants' conduct violated plaintiff's rights of procedural due process under the Fourteenth Amendment. Because plaintiff can pursue these claims by means of an adequate postdeprivation remedy in the state courts, he has failed to allege a federal constitutional violation."). To the extent plaintiff argues that its rights in the Article 78 appeal were denied due to the alleged coercive conduct of defendants, these allegations fall under plaintiff's First Amendment claim, not the procedural due process claim.

Thus, summary judgment is granted with respect to plaintiff's procedural due process claim.

### 3. First Amendment Claim

Though defendants seek summary judgment on all of plaintiff's claims, defendants do not separately move for dismissal of the First Amendment claim. As the Court has denied defendants' motion for summary judgment on the ground that plaintiff has not alleged or demonstrated injury, plaintiff's First Amendment claim is not decided at this juncture. Defendants may move for summary judgment on the First Amendment claim, if they wish to do so, in a supplemental submission.

### C. Qualified Immunity

The individual defendants argue, in the alternative, that they are entitled to summary judgment on qualified immunity grounds with respect plaintiff's claims. (Defs.' Br. at 16-18.) Because the Court grants summary judgment on plaintiff's substantive and procedural due process claims, the Court need not reach the issue of qualified immunity with respect to those claims. In any event, plaintiff has not produced evidence that Thomas or Ehlers engaged in any conduct with respect to the denial of the 2002 Application. With respect to the First Amendment claim, given that defendants have not briefed the claim, the Court does not decide the issue of qualified immunity as applied to the First Amendment claim. Defendants may raise the issue of qualified immunity in a supplemental submission.

### IV. CONCLUSION

For the foregoing reasons, the Court denies defendants' motion for summary judgment on the ground that plaintiff has not alleged injury. The Court grants defendants' motion for summary judgment on plaintiff's substantive and procedural due process claims. As the defendants have not moved for summary judgment on the First Amendment claim, the Court denies without prejudice the defendants' motion for summary judgment with respect to qualified immunity as it relates to plaintiff's First Amendment claim.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 28, 2012
       Central Islip, NY

\* \* \*

Plaintiff is represented by David Antwork, Campanelli & Associates, 129 Front Street, Mineola, NY 11501. The attorney for the defendants is Phil Siegel, Smith Finkelstein, Lundberg, Isler & Yakaboski, LLP, 456 Griffing Avenue, P.O. Box 389, Riverhead, NY 11901.