# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 09-CV-4095 (JFB) (AKT)

————————————

### SOUNDVIEW ASSOCIATES,

Plaintiff,

VERSUS

### TOWN OF RIVERHEAD ET AL.,

Defendants.

————————————

**MEMORANDUM AND ORDER**
September 30, 2013

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Soundview Associates ("plaintiff" or "Soundview") brought this action against the Town of Riverhead (the "Town"), Richard Ehlers ("Ehlers"), and Dawn C. Thomas ("Thomas") (collectively, "defendants"), alleging violations of Soundview's First Amendment right to petition the government for redress of its grievances, its Fourteenth Amendment right to procedural due process, and its Fourteenth Amendment right to substantive due process.[1]

Specifically, plaintiff asserts that defendants violated its constitutional rights when, among other things: (1) defendants deprived Soundview in 2003 – in an arbitrary and capricious manner – of the ability to build a health spa (plaintiff's "2002 Application") on a 191-acre site in Riverhead, despite the existence of a 1982 Special Permit that allowed such construction, and (2) defendants wrongfully conditioned the processing of a separate application to construct a clubhouse on the property (the "2005 Applications") on plaintiff's withdrawal of its continuing application with the Town for the health spa, as well as plaintiff's withdrawal of a pending state court action challenging the 2003 health spa decision. Soundview initiated this action seeking compensatory and punitive damages, as well as attorney's

[1] Plaintiff also originally asserted violations of its Fifth Amendment rights to substantive and procedural due process, and asserted its claims against the Town Board, the Town Planning Department, and John Does and/or Jane Does #1-6. By Memorandum and Order dated July 14, 2010, this Court dismissed plaintiff's Fifth Amendment claims, as well as plaintiff's claims against the Town Board and the Town Planning Department. By a joint

stipulation ordered by Magistrate Judge Tomlinson on September 10, 2010, the John Does and/or Jane Does #1-6 were also dismissed from this action.

fees, under 42 U.S.C. § 1983 ("Section 1983") with respect to each claim.

On November 28, 2011, defendants moved for partial summary judgment. By Memorandum and Order dated September 28, 2012, this Court denied defendants' motion for summary judgment on the ground that plaintiff has failed to demonstrate injury. In so ruling, the Court reasoned that plaintiff had shown an injury sufficient to confer standing – namely, the adverse effect of defendants' conduct upon plaintiff's interest in the appeal of the Article 78 proceeding (contesting the denial of its resort and spa permit request). However, the Court granted defendants' motion as to plaintiff's substantive and procedural due process claims on the ground that plaintiff cannot demonstrate a federally protected property interest upon which to predicate such claims. Moreover, even assuming *arguendo* that plaintiff had a protected property interest, the Court concluded that its due process claims would still fail. As to the substantive due process claim, the undisputed facts demonstrate that the Town had legitimate interests that rationally could have been furthered by the denial of plaintiff's 2002 Application, including the preservation of the scenic easement, and no rational jury – even construing the facts most favorably to plaintiff – could find otherwise. With respect to the procedural due process claim, plaintiff failed to put forth any evidence that it was denied adequate process with respect to its submission of its 2002 Application, the hearings regarding the 2002 Application, or the ultimate denial of the 2002 Application. Thus, the uncontroverted evidence is that plaintiff was afforded adequate due process with respect to its 2002 Application. The Court declined to address the First Amendment claim, as defendants did not move for summary judgment on that claim

at the time, and also denied defendants' motion for summary judgment on qualified immunity grounds (on the basis that defendants' motion failed to clearly address the First Amendment claim in the context of qualified immunity) without prejudice to defendants filing another motion for summary judgment on that basis.

Presently before the Court is defendants' second motion for summary judgment made pursuant to Federal Rule of Procedure 56. Defendants move for summary judgment with respect to plaintiff's First Amendment right to petition claim on the basis that (1) plaintiff cannot demonstrate that the events surrounding its withdrawal of its appeal of a state court decision that affirmed the Town's denial of its 2002 Application constituted a violation of its First Amendment rights, and (2) the individual defendants – Ehlers and Thomas – are entitled to qualified immunity with respect to the First Amendment claim. For the reasons set forth in detail herein, the Court grants defendants' motion in its entirety.

Plaintiff has failed to set forth evidence from which a rational jury could find that plaintiff has satisfied any of the three elements of a First Amendment right to petition claim. First, because the undisputed evidence indicates that the Board's denial of plaintiff's 2002 Application did not constitute an abuse of discretion, but rather that the decision was based upon a clear analysis of the circumstances, plaintiff's appeal pertaining to that denial does not have First Amendment protection. Second, even assuming that plaintiff's appeal falls within the scope of First Amendment protection, plaintiff has failed to raise a genuine issue of material fact with respect to defendants' motivation for declining to process the 2005 Applications as submitted while the 2002 Application remained

unresolved. Because it is undisputed that both the 2005 Applications and the 2002 Application pertained to the same parcel of land, the Town determined that their environmental impact needed to be assessed in a coordinated fashion under the State's environmental laws. Accordingly, and as explicitly set forth in an email from defendant Thomas to plaintiff's tenant's counsel, defendants provided plaintiff's tenant with an opportunity to amend the 2005 Applications to include the spa proposed in the 2002 Application. However, this opportunity was not seized; instead, plaintiff withdrew its appeal related to the 2002 Application, making the Board's denial of that Application final. Given that the offer to amend was undisputedly not acted upon, any subsequent discussions that defendants may have been involved in about the need to withdraw the appeal could not rationally be found to have been motivated by a desire on the part of defendants to infringe upon plaintiff's First Amendment rights. Instead, any such discussion of withdrawing the appeal would have been offered as an alternative to the amendment option that plaintiff's tenant declined to exercise. Third, even if plaintiff could establish that its appeal was protected by the First Amendment and that defendants' refusal to proceed with the 2005 Applications as submitted was motivated by a desire to infringe upon plaintiff's First Amendment rights, the uncontroverted evidence indicates that plaintiff has not suffered the type of harm required in a First Amendment right of petition case. Because plaintiff's land sale to its tenant went forward for the contemplated $10 million despite defendant's alleged improper conduct, and because any other non-speech harms alleged by plaintiff are based on pure speculation, plaintiff has failed to establish the type of concrete non-speech harms

necessary to defeat summary judgment on this type of First Amendment right of petition claim. Moreover, to the extent that this is one of those cases where only an actual chilling of speech need be shown to constitute harm, defendant provided plaintiff's tenant with an opportunity to amend its 2005 Applications to include the spa proposed in the 2002 Application and, in effect, preserve plaintiff's right of appeal as to any decision ultimately rendered about construction of the spa. Said another way, had the amendment been made, rather than the appeal simply withdrawn, plaintiff's right to appeal any decision issued with respect to the spa project would have been preserved for a later date. For all of these reasons, plaintiff's showings on each of the three elements of its First Amendment claim are insufficient to defeat summary judgment.

Defendants Thomas and Ehlers also argue, in the alternative, that they are entitled to qualified immunity on the First Amendment claim. Because, based on the undisputed facts of this case, no rational jury could conclude that it was objectively unreasonable for defendants Thomas and Ehlers to believe that by declining to move forward with the 2005 Applications as submitted – so as to consider the cumulative environmental impact of both sets of projects proposed for the particular parcel of land – they were not violating a clearly established right, summary judgment on the issue of qualified immunity is warranted in their favor.

## I. BACKGROUND

### A. Factual Background

General familiarity with the case is assumed, based on the prior summary judgment briefing and the Court's September 28, 2012 Memorandum and

Order. However, for purposes of this opinion, the Court has summarized below the facts relevant to the First Amendment claim and the issue of qualified immunity.

The Court has taken the facts set forth below from the parties' depositions, affidavits, exhibits, and respective Rule 56.1 Statements of Facts.[2] Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of N.Y.*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 statement is cited, that fact is undisputed or the opposing party has not pointed to any evidence in the record to contradict it.[3]

### 1. The Property, the 1982 Special Permit, and Developments Prior to 2002

At some point prior to January 1982, plaintiff purchased a 191-acre parcel of land located in the Town of Riverhead, which bordered the Long Island Sound to the north, Oakleigh Avenue to the west, Sound Avenue to the south, and a privately owned farm, known as Wulforst Farm, to the east (the "initial parcel"). (Defs.' 56.1 ¶ 2.)[4] The

initial parcel was later improved with a clubhouse and a golf course located on the southern 140 acres of the property (the "golf course parcel"). (*Id.*)

On November 3, 1982, plaintiff obtained a special permit (the "1982 Special Permit") from the Town for the initial parcel to construct a 300-unit residential condominium complex, which included a tavern, restaurant, retail store, and health spa, subject to the requirements, restrictions, and/or limitations of the Riverhead Town Code. (*Id.* ¶ 3.) The 1982 Special Permit was conditioned on plaintiff's agreement to execute covenants and restrictions preserving the open space and prohibiting further development of the golf course parcel. (*Id.* ¶ 5.) The 1982 Special Permit also required that plaintiff grant the Town a scenic easement over the golf course parcel (*id.* ¶ 6), and that plaintiff submit a detailed site plan describing the specific development of the property and phases of proposed construction (*id.* ¶ 8). By Resolution Number 161 of 1983, the Town approved the detailed site plans submitted by plaintiff, which included a health club facility on the northern part of the property (thus, not on the golf course parcel). (*Id.* ¶ 9.)

According to the Riverhead Town Code in effect in 1982,

> Special permits of the Town Board shall be for whatever duration decided by the Town Board and as specified in the Town Board's resolution. If the Town Board fails to specify a period of time, said period shall be in perpetuity. In addition, the Town Board may condition the permit by requiring that the applicant actually begin use and complete the construction or use requirements in

---

[2] The Rule 56.1 Statements of Facts referenced in this section are those filed by the parties in connection with the first motion for summary judgment, as the parties did not file new 56.1 Statements for the second motion.

[3] Although the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court cites to the Rule 56.1 Statements, rather than to the underlying citations to the record, when utilizing the 56.1 Statements for purposes of this opinion.

[4] Plaintiff's predecessors in interest are entities known as Baiting Hollow Development Corporation and Riverhead Flagg Corporation. (Defs.' 56.1 ¶ 1.) Those entities purchased the initial parcel. (*Id.*) For purposes of this Memorandum and Order, the Court refers to plaintiff and its predecessors in interests collectively as "plaintiff."

compliance with the conditions imposed by the Town Board within a time period of from one (1) to three (3) years, decided by the Town Board and set forth in the resolution granting said permit. If the Town Board fails to specify a period, said period shall be one (1) year.

(*Id.* ¶ 12.) The 1982 Special Permit does not specify a period for plaintiff to begin use and complete construction or use requirements of the 1982 Special Permit. (*See* Decl. of David A. Antwork in Opp'n to Second Mot. for Summ. J. ("Antwork Second Decl.") Ex. A, 1982 Special Permit.) Plaintiff never constructed the health club facility depicted on its site plan or any other health club facility or health spa. (Defs.' 56.1 ¶ 13; *see also* Aff. of Neil Rego in Opp'n to First Mot. for Summ. J. ("Rego Aff.") ¶ 10 (partner of Soundview stating the following: "Soundview's predecessors in interest proceeded with development of and conveyance of the condominiums, but did not, at the time, obtain site plan approval for nor construct the health spa.").)

In April 1983, plaintiff and the Town executed a grant of scenic easement, which provided the following:

1. The use and development of the "Recreation and Open Space Preserve" will be forever restricted to some or all of the following:

   a. golf club and golf course open to public or private membership, as the case may be;

   b. golf club and golf course facilities including, but not limited to, restaurant, public or private, separate catering facilities and tavern;

   c. jogging paths, cycling paths, riding paths;

   d. retail stores specializing in golf, tennis and swimming equipment and apparel, limited to not more than one of each store;

   e. any other compatible recreational uses.

(Decl. of Dawn Thomas in Supp. of First Mot. for Summ. J. ("Thomas First Decl.") Ex. F, Grant of Scenic Easement.) The grant also included some restrictions. (*Id.*) Among other things, the restrictions stated that "except to the extent specifically required or used for or in aid of the . . . permitted uses . . . no residential structures, the approved condominium units notwithstanding, shall be erected" and "no temporary or permanent non-residential structures . . . shall be placed or erected thereon." (*Id.*)

The scenic easement states that the agreement between plaintiff and the Town to grant the easement is pursuant to New York General Municipal Law § 247, which authorizes the acquisition of interests or rights for the preservation of open spaces. (*Id.*); *see also* N.Y. Gen. Mun. Law § 247. According to the declaration of Ehlers, the Town's attorney, pursuant to New York General Municipal Law § 247, plaintiff was afforded real property tax reductions on the value of the golf course parcel. (Decl. of Richard A. Ehlers in Supp. of Second Mot. for Summ. J. ("Ehlers Decl.") ¶ 13.)

Ehlers contends that, as of 2002, plaintiff had constructed or conveyed the rights to construct 300 condominium units pursuant to the plans it had submitted. (*Id.* ¶ 17.)

Both parties agree that plaintiff itself constructed 126 units. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48; Defs.' Letter at 3, Sept. 21, 2012, ECF No. 50; Defs.' Ex. LL, Planning Board Letter.) According to the deposition testimony of Pasquale Intrieri, Rego's partner, plaintiff sold the rights to construct the remaining 174 units to another entity called High Orchard.[5] (Defs.' Ex. NN,[6] Intrieri Deposition Transcript ("Intrieri Dep.") at 20-21; Decl. of David A. Antwork in Support of First Mot. for Summ. J. ("Antwork First Decl.") Ex. S, Intrieri Dep. at 92.) The parties agree that, at some point, the maximum number of units permitted was reduced by agreement to 270 units. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48; Defs.' Letter at 2, Sept. 21, 2012, ECF No. 50.) According to a planning board letter to counsel for "The Knolls at Fox Hill, Inc.", an entity constructing residential units, 250 of the 270 permitted units had been constructed by January 5, 2001, and the planning board approved six additional units at that time. (Defs.' Ex. LL, Planning Board Letter.) With respect to this issue, plaintiff submitted a document which states that only 216 units had been constructed at this time. (Pl.'s Suppl. Ex. B, Key Map Excerpt.) Defendants contend that this document was based on a survey of the land as it existed in 1995, and that the planning board's calculation is the correct assessment as to the number of units constructed in 2002. (Defs.' Letter at 3, Sept. 21, 2012, ECF No. 50.)

Prior to 2002, the golf course parcel was divided out of the initial parcel. (Defs.' 56.1 ¶ 14.) In or about 1996, the plaintiff leased the golf course parcel to Rugby Recreational Group, LLC ("Rugby"). (Id. ¶ 15.) Under the terms of the lease between the plaintiff and Rugby, Rugby held an option to purchase the golf course parcel for $10 million. (Id.)

## 2. The 2002 Application and Resultant Proceedings

In 2002, plaintiff applied to the Town for a special permit (the "2002 Application") to construct a 48 unit residential development complex with a spa on the golf course parcel. (Id. ¶ 17.) According to the 2002 Application site plan, the spa and resort was to total 78,100 square feet. (Thomas First Decl. Ex. L, 2002 Application Site Plan.) The 2002 Application sought approval to construct the complex on an open and unimproved portion of the golf course parcel. (Defs.' 56.1 ¶ 20.) An electric easement burdens the southwest corner of the golf course parcel and runs through the open space where the 2002 Application proposed to construct the 48 unit complex. (Id. ¶ 18.)[7] Pursuant to Riverhead Town Code Section 108-125 in effect at the time of the application, the recreational use zoning district required all lots to have 500 feet of frontage along the Long Island Sound or other body of water. (Id. ¶ 19.) Because, by this time, the golf course parcel had become a separate and distinct property from the initial parcel, it had no footage on the Long Island Sound. (Id. ¶ 16.)

By resolution, the Riverhead Town Board denied the special permit application on November 18, 2003. (Id. ¶ 21.) In the resolution denying the 2002 Application, the

---

[5] Plaintiff does not present any other evidence as to the exact number of units plaintiff sold the rights to construct. (Pl.'s Letter at 5, Aug. 17, 2012, ECF No. 48.)

[6] Defendants' Exhibits NN and LL were submitted in support of their first motion for summary judgment by letter dated September 21, 2012. *See* ECF No. 50.

[7] Ehlers explains that the electric easement is 10 feet wide and prevented plaintiff's proposed construction in the area. (Ehlers Decl. ¶ 23.)

Town Board found, among other things, that the site was not suitable for the proposed development as it was "encumbered by covenants and restrictions . . . intended to restrict the allowable uses of the property and do not allow the construction of a health spa."[8] (Thomas First Decl. Ex. N, Town Board Resolution.) Moreover, according to Ehler, the Town found that plaintiff had reached its maximum yield on the initial parcel and had agreed to restrict any further development on the golf course parcel. (Ehlers Decl. ¶ 24.)

On March 18, 2004, plaintiff commenced an Article 78 proceeding in New York State Supreme Court, Suffolk County. (Defs.' 56.1 ¶ 22.) By decision dated April 19, 2005, the New York State Supreme Court dismissed the proceeding. (Id. ¶ 23.)

### 3. The 2005 Applications

On or about June 15, 2005, Wulforst Farms, LLC ("Wulforst") – a sister company to Rugby – purchased a privately owned farm, known as Wulforst Farm, directly east of the golf course parcel, consisting of approximately 40 acres (the "Wulforst parcel"). (Id. ¶ 25.) On or about November 18, 2005, the plaintiff and Wulforst jointly filed applications with the Town (the "2005 Applications") to, among other things: (1)

modify the boundary lines of the respective properties so as to subtract ten acres from the Wulforst parcel and add it to the golf course parcel; (2) subdivide the remaining thirty acres of the Wulforst parcel into a thirty lot clustered subdivision development; and (3) construct a new multi-million dollar clubhouse on the golf course parcel, to be known as the Baiting Hollow Club. (Id. ¶ 26.) The 2005 Applications did not mention the 48 unit, 78,100 square foot, residential spa complex that was the subject of the 2002 Application.[9] (Id. ¶ 28.)

On April 25, 2006, plaintiff filed a notice of appeal of the decision dismissing the Article 78 proceeding. (Id. ¶ 24.) On or about October 23, 2006, plaintiff perfected its appeal of the decision dismissing the Article 78 proceeding. (Id. ¶ 31.)

In or about October of 2006, defendants learned that plaintiff and Wulforst intended to pursue both the 2002 Application as well as the Baiting Hollow Club on the golf course parcel (a subject of the 2005 Application). (Id. ¶ 30.) Ehlers and Thomas, the Town's Planning Board Attorney, claim that they informed plaintiff's counsel that the two projects were related because they were proposed on the same property, and the 2005 Applications would need to be amended to include the 2002 Application so that the Town could study the cumulative impacts of both projects as required by New York's State Environmental Quality Review

---

[8] The Town Board also found that (1) adequate provisions have not been made for the collection and disposal of solid wastes, (2) because land had been set aside for agricultural use or recreational turf, the land cannot be used for Suffolk County density calculations and prior applications for development maximized the allowable sewage flow, (3) the disadvantages of the intense development outweighed the advantages to be gained, and (4) the intense sewage flows that would be generated from the property would adversely affect the health, safety, and welfare of the community at large. (Thomas First Decl. Ex N., Town Board Resolution.)

---

[9] Plaintiff objects to this statement because it "attempts to portray that Rugby/Wulforst's 2005 Applications were submitted jointly with the plaintiff which is not the case." (Pl.'s 56.1 ¶ 28.) However, as discussed in the Court's September 28, 2012 Memorandum and Order, plaintiff admits that the 2005 Applications were submitted jointly in paragraph 26 of that statement, and plaintiff's evidence with respect to paragraph 28 does not demonstrate that the applications were not submitted jointly.

Act ("SEQRA"). (Ehlers Decl. ¶ 30; Decl. of Dawn C. Thomas in Supp. of Second Mot. for Summ. J. ("Thomas Second Decl.") ¶ 25.)

According to the deposition testimony of Barry Beil ("Beil"), a principal of Rugby/Wulforst, Town officials told Beil that the 2005 Applications would be processed expeditiously if the Soundview lawsuit "went away." (Antwork First Decl. Ex. B, Barry Beil Dep. Tr. ("Beil Dep.") at 219.) According to Beil, he was informed at a meeting that Thomas did not want to deal with the Soundview appeal. (*Id.* at 235.) Beil further testified that Thomas stated that she was convinced that Soundview's appeal had no merit, but that she had a busy week and until the lawsuit was resolved, "the issues relating to the application were still not going to move forward and so the way to move the application forward was for us to take care of this appeal." (*Id.* 236.)

Stanley Pine ("Pine"), another principal of Rugby/Wulforst, testified that

[Thomas] was going to have to answer an appeal or some kind of papers that Neil Rego had made application or lawsuit or – and Dawn Thomas came to Barry Beil and I and requested, insisted – Ms. Thomas was – I'm not sure the right term to use, but wanted us to entice or induce Mr. Rego to relinquish his application and interest in building this. I think she had to put in an answer to an appeal or something of that nature and she was about to have to put in an answer and she, instead of putting in the answer, turned up the heat on Mr. Beil and myself to induce Mr. Rego to drop his application or his appeal or interest in that spa.

(Antwork First Decl. Ex. D, Stanley Pine Dep. Tr. ("Pine Dep.") at 47-48.) According to Pine, "we couldn't get our project moved forward unless we assisted in having [Rego] relinquish his application for a spa." (*Id.* at 105.)

According to Thomas' and Ehlers' declarations, at a meeting on or about November 29, 2006, Beil informed defendants that he was purchasing the golf course parcel and did not plan on pursuing the 2002 Application. (Ehlers Decl. ¶ 35; Thomas Second Decl. ¶ 32.) Beil stated that he did not wish to amend the 2005 Applications and would withdraw plaintiff's appeal of the state case so that the 2005 Applications could proceed expeditiously. (Thomas Second Decl. ¶ 32.) By email dated December 13, 2006, Thomas again informed counsel for both plaintiff and Wulforst that if plaintiff intended to proceed with its appeal and the pursuit of the 2002 Application, it was her opinion that the 2005 Applications would have to be amended to include the 2002 Application's proposed development. (*Id.* ¶ 33; Decl. of Phil Siegel in Supp. of Defs.' Second Mot. for Summ. J. ("Siegel Decl.") Ex. F, Dec. 13, 2006 Email from Thomas.)

On January 29, 2007, plaintiff withdrew its appeal of the state Article 78 proceeding. (Defs.' 56.1 ¶ 39.)[10] After the appeal was withdrawn, the 2005 Applications were approved. (*See* Ehlers Decl. ¶ 38.) The Baiting Hollow Club was ultimately constructed on the golf course parcel. (*Id.*)

---

[10] According to Thomas, plaintiff's appeal was withdrawn without any protest or complaint. (Thomas Decl. ¶ 35.) Ehlers also stated that at no point in time did plaintiff object to withdrawing the appeal or the 2002 Application (Ehlers Decl. ¶ 36), and that, instead, plaintiff's sole focus was to obtain approvals for the 2005 Applications as fast as possible (*id.* ¶ 39).

On or about January 16, 2008, plaintiff consummated its transaction with Rugby by selling the golf course parcel for the full contract price of $10 million. (Defs.' 56.1 ¶ 41.) At his deposition, Rego testified that Rugby had been required to close on this option even if the 2005 Applications had been denied, as Rugby had failed to give plaintiff the requisite six months' notice to cancel the purchase. (Siegel Decl. Ex. E, Dep. of Neil Rego ("Rego Dep.") 229-39.) In consideration for withdrawing the appeal of the state Article 78 proceeding and the 2002 Application, Rugby/Wulforst granted plaintiff the right to collect rents from the original clubhouse for an additional 198 years and granted two of the partners of the plaintiff two-year extensions on their personal consulting agreements with Rugby. (Defs.' 56.1 ¶¶ 43-44.)

B. Procedural History

Plaintiff filed the complaint in this action on September 23, 2009. On February 8, 2010, defendants filed a motion to dismiss the complaint. On July 14, 2010, the Court issued a Memorandum and Order granting in part and denying in part defendants' motion to dismiss the complaint.

Defendants then moved for summary judgment on November 28, 2011. Plaintiff filed its opposition on January 17, 2012, and defendants filed their reply in further support of their motion for summary judgment on February 21, 2012. The Court held oral argument on the motion on April 4, 2012. At a conference held on May 3, 2012, the Court directed the parties to submit revised Rule 56.1 Statements to fully comply with Local Rule 56.1. Defendants submitted revised 56.1 Statements on May 16, 2012 and May 18, 2012. Plaintiff filed a revised 56.1 Counterstatement on May 22, 2012. On August 8, 2012, the Court held a

conference to address the following issues: (1) the number of units constructed on the initial parcel, and (2) the relevant town code provisions. Plaintiff submitted a letter on those issues on August 17, 2012, and defendants responded on September 21, 2012.

By Memorandum and Order dated September 28, 2012, the Court granted in part and denied in part defendants' motion for summary judgment. With respect to the standing issue raised by defendants, the Court denied the motion on that basis, concluding that plaintiff's allegation that its interest in the appeal of the Article 78 proceeding was adversely affected by the coercive conduct of the individual defendants is an interest sufficient to confer standing upon plaintiff. However, the Court granted defendants' motion for summary judgment with respect to plaintiff's procedural and substantive due process claims on the basis that, based on the uncontroverted evidence, plaintiff could not demonstrate a federally protected right upon which to base such claims. The Court denied defendants' motion with respect to the qualified immunity issue because defendants had failed to clearly address the issue in the context of the First Amendment claim, but permitted defendants to move for summary judgment on the First Amendment claim, including based on qualified immunity, at a later date.

Defendants filed their second motion for summary judgment on December 7, 2012. Plaintiff filed an opposition on January 7, 2013, and defendants filed a reply in further support of their motion on January 18, 2013. The Court held oral argument on the second motion for summary judgment on March 8, 2013. The Court has fully considered the submissions of the parties.

## II. STANDARD OF REVIEW

The standard for summary judgment is well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

## III. DISCUSSION

### A. First Amendment Claim

Plaintiff asserts that defendants violated its constitutional rights under Section 1983. To state a claim under Section 1983, a plaintiff must allege: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983; *see also Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999). Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal

rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

Specifically, plaintiff claims that defendants unlawfully deprived plaintiff of its right to petition the government for the redress of grievances, by "effectively extorting the plaintiff into withdrawing its appeal" (of the New York State Supreme Court's dismissal of plaintiff's Article 78 proceeding about the Board's denial of plaintiff's 2002 Application) in violation of the First Amendment. (*See* Pl.'s Mem. of Law in Opp'n to Second Mot. for Summ. J. ("Pl.'s Opp'n") at 9.) To prevail on this free speech claim, plaintiff must show that: "(1) [it] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001); *see also Terwilliger v. McLeod*, 3:12-cv-1750 (TJM/DEP), 2013 U.S. Dist. LEXIS 130183, at *16 (N.D.N.Y. Sept. 12, 2013) (applying *Curly* factors to a First Amendment claim brought in a similar context).

Defendants presently move for summary judgment on the First Amendment claim, arguing that: (1) plaintiff's appeal lacked a "reasonable basis" and, therefore, is not protected by the First Amendment right to petition the government for redress, and (2) none of the defendants engaged in conduct that proximately caused the damages that allegedly resulted from plaintiff's withdrawal of its appeal. For the reasons discussed in detail below, the Court concludes that plaintiff has failed to raise any genuine issues of material fact with respect to any of the three prongs of its First Amendment right to petition claim. Because

no rational jury could, therefore, find in plaintiff's favor on the requisite elements of the First Amendment claim, defendants' motion for summary judgment is granted.

### 1. First Amendment Protection

Plaintiff claims that the interest entitled to First Amendment protection at issue in this case is its right of access to the courts. Specifically, plaintiff claims that it had a "constitutional right to avail itself of the New York State Court System" for purposes of appealing the New York State Supreme Court's dismissal of its Article 78 petition (Compl. ¶ 134), a right that defendants infringed.

"The Supreme Court has described the right to petition government for redress of grievances as 'among the most precious of the liberties safeguarded by the Bill of Rights.'" *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988) (quoting *United Mine Workers v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967)). It is well-settled that "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 741 (1983); *see also City of N.Y. v. Beretta U.S.A. Corp.*, 524 F.3d 384, 397 (2d Cir. 2008). Thus, commencing an appeal of Article 78 proceedings – the conduct that plaintiff engaged in – may constitute protected activity under the First Amendment. *See Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) (explaining that plaintiff's commencement of Article 78 proceedings was protected by the First Amendment); *Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir. 1991) (accepting the argument that "the institution of an Article 78 lawsuit may constitute first amendment protected activity"). Defendants argue, however, that because plaintiff's

particular appeal lacked a "reasonable basis," it should not be afforded First Amendment protection. (*See* Defs.' Mem. of Law in Supp. of Second Mot. for Summ. J. ("Defs.' Mot.") at 12-14.)

Defendants are correct that, like the right to free speech, the right to petition the government for redress of grievances is not absolute. Because lawsuits that lack a "reasonable basis" do not fall within the scope of First Amendment protection, "baseless litigation is not immunized by the First Amendment right to petition." *Bill Johnson's Rests.*, 461 U.S. at 743 (explaining that, "by definition, the plaintiff in a baseless suit has not suffered a legally protected injury"). The Supreme Court has thus explained that "sham litigation," or "litigation based on intentional falsehoods or on knowingly frivolous claims," does not come under the First Amendment right to petition. *Id.* By the same token, courts have recognized the need for "some room for good faith error," so as not to chill the bringing of meritorious lawsuits. *Alvarez v. City of N.Y.*, 31 F. Supp. 2d 334, 343 (S.D.N.Y. 1998) (citing *Hancock v. Thalacker*, 933 F. Supp. 1449, 1486-87 (N.D. Iowa 1996) ("When the right to petition is in question, there is also a heightening of requirements to show falsity or frivolousness of complaints, similar to that observed in the 'free speech' realm . . . . The courts must not only tolerate, but must impose constitutional protection of the right of petition to an extent that necessarily encompasses some false claims in order to prevent an unconstitutional chill on complaints that matter.")).

In arguing that plaintiff's appeal was the type of "baseless litigation" not afforded First Amendment protection, defendants outline nine different reasons why the development proposed in the 2002 Application was prohibited and, therefore, why any appeal of the State Court's dismissal of plaintiff's Article 78 proceeding about the Board's denial of plaintiff's 2002 Application lacked a reasonable basis. As a preliminary matter, the Court notes that, under the Riverhead Town Code, the Town Board and the Planning Board may consider a number of different factors when evaluating a special permit application, *i.e.*, whether the site is suitable for the use and whether adequate provisions have been made for sewage. Riverhead Town Code § 108-133.5. In addition, under the Riverhead Town Code, the Town may consider a number of factors when evaluating a site plan. *Id.* §§ 108-128 through 108-133. Thus, although the Board is required to consider certain standards, the ultimate decision as to whether to grant a land use application lies with the Board. *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 504 (2d Cir. 2001) ("Under New York law, the Board has the power to grant and deny special use permits within its 'untrammeled, but of course not capricious discretion . . . with which courts may interfere only when it is clear that the Board has acted solely upon grounds which as a matter of law may not control.'" (quoting *Retail Prop. Trust v. Bd. of Zoning Appeals of Hempstead*, 722 N.Y.S.2d 244, 246 (2d Dep't 2001))); *see also Lemir Realty Corp. v. Larkin*, 11 N.Y.2d 20, 24 (1962) ("Board action refusing to grant a 'special exception' is by definition and in essential character discretionary and not a denial of a right," and is, therefore, reviewable only for "illegality, arbitrariness, or abuse of discretion . . . ."). Defendants point to various problems with plaintiff's 2002 proposal – issues that they claim justified the Board's exercise of its discretion to deny the 2002 Application and, as such, highlight the frivolous nature of plaintiff's appeal of

an Article 78 proceeding initiated based on that denial. The Court addresses the most persuasive of defendants' arguments in turn.

The first portion of defendants' justifications for the Board's denial of the 2002 Application pertain to regulations established by the 1982 Special Permit that would have been violated by plaintiff's proposed construction. For example, it is undisputed that the 1982 Special Permit was conditioned on plaintiff's agreement to preserve the open space and prohibit further development on the golf course parcel (Defs.' 56.1 ¶ 5; *see also* Ehlers Decl. ¶ 8 (explaining that, at the hearing at the 1982 Town Board Meeting, plaintiff's attorney and principal testified that "construction would be clustered on the bluff and the Golf Course Parcel would be preserved in its natural state 'forever and ever'")), yet the 2002 Application proposed construction of a 48-unit complex on the golf course parcel. In addition, the 1982 Special Permit required that plaintiff grant the Town a scenic easement over the golf course parcel (Defs.' 56.1 ¶ 6), thereby restricting plaintiff's use of the exact parcel upon which the 2002 Application proposed construction. Thus, it is undisputed that plaintiff sought, via its 2002 Application, to construct a 78,100 square foot resort and spa on a parcel of land that was encumbered by a scenic easement restricting the land to "open space and preserve." (*See* Thomas First Decl. Ex. F ("[E]xcept to the extent specifically required or used for or in aid of the . . . permitted uses . . . no residential structures, the approved condominium units notwithstanding, shall be erected . . . [and] no temporary or permanent non-residential structures . . . shall be placed or erected thereon.").)[11] Moreover, the uncontroverted

evidence demonstrates that plaintiff's proposal would have caused it to exceed the maximum number of units of development permitted by the Special Permit – for the parties agree that the maximum number of units permitted was at some point reduced from 300 to 270, and the planning board's assessment of the number of units constructed by January 5, 2001 indicates that 250 of the 270 had been erected and that 6 more units were being approved (*see* Defs.' Ex. LL),[12] meaning that the 48 additional units proposed by plaintiff in its 2002 Application would have caused plaintiff to exceed its allowance under the Special Permit as amended.[13]

_____

language allowing the property to be used for "any other compatible recreational use" (Thomas First Decl. Ex. F), as the Court explained in its September 23, 2012 Memorandum and Order, and as plaintiff does not dispute, the Board had considerable discretion in deciding the 2002 Application by virtue of the provisions of the Scenic Easement.

[12] During the first round of summary judgment, plaintiff disputed this assessment by submitting a document which states that only 216 units had been constructed. (Pl.'s Suppl. Ex. B, Key Map Excerpt.) Defendants claimed that the document was based on a survey of the land as it existed in 1995, and that the planning board's calculation from its January 5, 2001 meeting is the correct assessment as to the number of units constructed by 2002. (Defs.' Letter at 3, Sept. 21, 2012, ECF No. 50.) The Court finds defendant's argument to be meritorious. Based on its reading of the planning board document, the Court concludes that plaintiff's submission is an assessment of the land that was made earlier in time to that of the planning board – for the planning board document affirmatively states that 250 units had already been constructed (and also approves the building of 6 additional units), and there is no evidence in the record that any units, once constructed, were later removed (thereby causing the 250 unit count to drop down to 216).

[13] In addition, although the issue was not raised during this round of briefing, the Court notes that, as discussed in its September 23, 2012 Memorandum and Order, the fact that plaintiff's site plan submitted in connection with the Special Permit – which

_____

[11] Although plaintiff has argued that its proposed spa should have been permitted under the easement's

Defendants also point to the fact that a 10-foot wide electric easement burdened the southwest corner of the golf course, thereby running through the open space where the 2002 Application proposed to construct the 48 unit complex. (Defs.' 56.1 ¶ 18; *see also* Ehlers Decl. ¶ 23.) In addition, pursuant to Riverhead Town Code Section 108-125 in effect at the time of the 2002 Application, the recreational use zoning district required all lots to have 500 feet of frontage along the Long Island Sound (Defs.' 56.1 ¶ 19), a requirement that plaintiff's 2002 proposal could not satisfy because, by that point in time, the golf course parcel no longer had frontage on the Long Island Sound (*see* Ehlers Decl. ¶ 20). Finally, defendants note the Town Board's findings with respect to sewage and waste – (1) that adequate provisions had not been made for the collection and disposal of solid wastes; (2) that the intense sewage flows that would be generated from the property would adversely affect the health, safety, and welfare of the community at large; and (3) that the golf course parcel could not support any further sewage flow from the additional development proposed in the 2002 Application (*see* Thomas First Decl. Ex. N, Town Board Resolution; Thomas Second Decl. ¶ 19) – findings that plaintiff does not dispute.

Based upon these undisputed facts, no rational jury could conclude that the Board abused its discretion by denying plaintiff's 2002 application. Thus, any rational jury would find, based on the uncontroverted facts of this case, that plaintiff's repeated litigious efforts to overturn the Board's discretionary and well-reasoned determination were without a reasonable basis and, as such, outside the scope of the First Amendment's protections.[14] Because plaintiff's "baseless" appeal "is not immunized by the First Amendment right to petition," *Bill Johnson's Rests.*, 461 U.S. at 743, plaintiff has failed to establish the first element of its First Amendment claim – the existence of a constitutionally protected interest. Accordingly, summary judgment on the First Amendment claim is warranted in defendants' favor.

---

proposed construction of a "health club" – was approved by the Board has no bearing on the question of whether plaintiff was entitled to construct the spa proposed in its 2002 Application. This is because the site plan approved by the Town for the 1982 Special Permit placed the "health club" within the condominium complex on the northern portion of the initial parcel, not on the golf course portion of the parcel where the 2002 Application proposed construction. Thus, plaintiff's 1982 proposed "health club" is entirely different from plaintiff's 2002 proposed spa, and the fact that the former proposal was approved by the Board in no way entitled plaintiff to approval of its latter one. Moreover, because the Town Board never specified a period for the 1982 site plan's use and completion, plaintiff had one year from the date of approval to construct the proposed "health club." (*See* Defs.' 56.1 ¶ 12 (explaining that when the Town Board fails to specify a time period for applicant's completion of construction permitted by special permit, the period is one year).) However, the "health spa" depicted on the site plan was not built within a year (or, for that matter, ever) and, accordingly, plaintiff has no viable argument that the site plan submitted with the 1982 Special Permit, which was approved by the Board, contemplated the spa proposed by plaintiff nearly twenty years later.

---

[14] The Court notes that this is not the type of case where there is any indication that plaintiff's litigious attempts were made in bad faith. However, because, for the reasons discussed *supra*, the Court agrees with defendants that plaintiff's appeal was frivolous, it constitutes the type of baseless litigation not protected by the First Amendment right to petition. *See Bill Johnson's Rests.*, 461 U.S. at 743.

## 2. Defendants' Actions

Even assuming *arguendo* that plaintiff's appeal was protected by the First Amendment right to petition, plaintiff's claim would still fail due to plaintiff's inability to satisfy the second and third prongs of the *Curley* test – namely, demonstrating that defendants Ehlers' and Thomas' actions were motivated by plaintiff's exercise of its First Amendment right of appeal and served to effectively chill plaintiff's protected speech. *See Curley*, 268 F.3d at 73.

In order to put the second and third prongs of plaintiff's claim into context, the Court first summarizes plaintiff's theory of First Amendment liability. As set forth in the complaint, plaintiff alleges that "defendants intentionally interfered with and violated the plaintiff's right to petition government for the redress of grievances by deliberately coercing and unlawfully extorting the plaintiff to abandon [its] right to appeal by threatening to withhold processing of the land use applications of the plaintiff's tenant which would have led to the financial ruin of the plaintiff." (Compl. ¶ 127). The "land use applications" plaintiff refers to are the 2005 Applications (which included the proposed multi-million dollar clubhouse for the golf course parcel, to be known as the Baiting Hollow Club) and the "tenant" plaintiff references is Rugby. Thus, plaintiff's argument is three-fold: (1) defendants threatened Rugby that, in the event plaintiff failed to withdraw its appeal related to the 2002 Application, Rugby's 2005 Applications would be "derailed" (*id.* ¶¶ 128-29 (alleging that Rugby was told that the 2005 Applications would not be processed unless the appeal was withdrawn)); (2) that threat caused plaintiff to withdraw its appeal out of fear that Rugby would decline to close on its $10 million option (thereby causing a great deal of financial loss to plaintiff) if its application for the clubhouse was not approved; and (3) plaintiff was harmed as a result (*id.* ¶ 129). For the reasons set forth in detail below, based upon the uncontroverted facts of this case, no rational jury could conclude (1) that defendant's refusal to process the 2005 Applications without amendment was motivated by a desire to infringe upon plaintiff's First Amendment rights, (2) that any suggestion of withdrawing the appeal, even if made by defendants, was motivated by a desire to infringe upon plaintiff's First Amendment rights, or (3) that plaintiff suffered the type of harm that gives rise to a First Amendment cause of action of the type alleged.

### a. Second Prong: Defendants' Motivation

To satisfy the second prong of the *Curley* test, a plaintiff must show that a defendant's actions were motivated or substantially caused by plaintiff's exercise of its First Amendment Right. *Curley*, 268 F.3d at 73; *see also Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 195 (2d Cir. 1994) ("The ultimate question of retaliation involves a defendant's motive and intent . . . ."). Thus, plaintiff here must demonstrate that Ehlers' and Thomas' "threat" not to approve or move forward with the 2005 Applications was motivated by plaintiff's appeal of the Article 78 proceeding.

To prove this nexus aspect of its First Amendment claim, plaintiff offers various portions of the deposition testimony of two of Rugby/Wulforst's principles, Beil and Pine. The testimony pertains to Beil's and Pine's discussions with Ehlers and Thomas, during which Beil and Pine claim that they were told that their applications for the construction of the Baiting Hollow clubhouse could not go forward while

plaintiff's appeal and health spa application were pending. For example, Beil testified that they were told that, "until [the appeal] got resolved[,] the issues relating to the [clubhouse] application were still not going to move forward and so the way to move the application forward was for [them] to take care of this appeal" (Beil Dep. at 236), and that their clubhouse "application would be processed [] expeditiously if the Soundview application lawsuit went away" (*id.* at 219). Pine similarly testified, *inter alia*, that "the Town wouldn't go forward with [their] application unless [they] assisted them in helping to get Neil to withdraw his application" (Pine Dep. at 89), and that it was their understanding that "[i]f [they] could get Neil to withdraw his application for a spa [they would get [their] – [they] could move forward with [their] plans" (*id.* at 135; *see also id.* at 105 ("We didn't get our subdivision until – we didn't get some approvals until we induced Neil to remove, to relinquish his application for a spa.")). Plaintiff argues that all such testimony confirms that defendants' "threats" to not move forward with the 2005 Applications and its derailment of those Applications were motivated by plaintiff's exercise of its First Amendment right of appeal. (*See* Pl.'s Opp'n at 18 ("Through defendants Thomas and Ehlers informing plaintiff's tenant, Rugby, that any of its applications for the construction of their clubhouse would be derailed unless Rugby was able to get its landlord, the plaintiff, to withdraw its appeal and thus give up its rights, it is evident that the defendants' actions were substantially motivated by the plaintiff's exercise of its First Amendment right of access to the courts.").)

The problem with plaintiff's argument, however, is that it ignores the fact that the 2002 Application upon which plaintiff's appeal was based pertained to the *same*

parcel of land as the 2005 Applications, and that defendants were, therefore, compelled to consider the environmental impact of those projects together, under The New York State Environmental Quality Review Act ("SEQRA"), so long as both projects were being pursued.

Pursuant to SEQRA, the Town is required to analyze and mitigate the potential environmental impacts of any proposed land use. (*See* Thomas Second Decl. ¶ 25.) Thomas and Ehlers both stated that, upon receiving the 2005 Applications, the Town began engaging in the type of environmental impact review demanded by SEQRA. (*See id.*; *see also* Ehlers Decl. ¶ 30.) However, at some later point in time, defendants learned that plaintiff had perfected its appeal of the Article 78 proceeding, thereby reinstating litigation over the 2002 Application and making the Board's dismissal of the 2002 Application not yet final. (*See* Thomas Second Decl. ¶¶ 27-29.) At that point, defendants realized that plaintiff intended to pursue *both* the 2002 and 2005 Applications. (*See id.* ¶ 29; Ehlers Decl. ¶ 32.) It is undisputed that the 2002 Application proposed construction of a spa on the golf course parcel, and that the 2005 Applications proposed construction of a clubhouse on the golf course parcel. Thus, it is uncontroverted that both the 2005 Applications and the 2002 Application (and the appeal related to that application) that plaintiff was pursuing pertained to the same exact parcel of land.

Defendants assert that when they began their SEQRA review of the 2005 Applications, they were operating under the assumption that the Board's denial of the 2002 Application was in force and, therefore, that they merely needed to analyze the impact of the 2005 Applications on the golf course parcel in isolation to

comply with SEQRA. However, because the 2002 Application also pertained to the golf course parcel, defendants concluded that they were required, under SEQRA, to examine the combined effects of the 2002 and 2005 Applications on the golf course parcel while the Board's dismissal of the 2002 Application remained the subject of litigation and, therefore, a construction project that plaintiff was still pursuing for the golf course parcel. (*See* Siegel Decl. Ex. I, Dec. 5, 2006 Beil Memo (explaining that reviewing applications for a particular piece of land on a piecemeal basis is not SEQRA compliant and, "if challenged in Court, would be found to be in violation of SEQRA procedure and set aside").) Given that both the 2002 and 2005 Applications proposed construction on the same piece of land, and that SEQRA calls for cumulative, environmental impact analyses, *see Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 647 (2d Cir. 1999) ("An agency making a SEQRA determination is required to consider the cumulative impact of its action when applications are related . . . ."), no rational jury could conclude that defendants' refusal to process the 2005 Applications standing alone (without a simultaneous consideration of the environmental impact of the construction proposed in the 2002 Application) once it learned that the 2002 Application was still being pursued was motivated by anything other than SEQRA.[15]

Defendants thus determined (and informed Rugby) that, so long as the pursuit of the 2002 Application continued, the 2005 Applications had to be amended to include the construction contemplated by the 2002 Application, so that the Town could study the cumulative effects of both proposals on the golf course parcel. (*See* Ehlers Decl. ¶ 32 ("[T]he 2005 Applications would need to be amended to include the 2002 Application so the Town could study the cumulative impacts of both as required by SEQRA regulations."); Thomas Second Decl. ¶ 30 ("A short time after plaintiff perfected its appeal, I informed counsel for plaintiff that the two projects were related since they were proposed on the very same parcel of property. As a result, the 2005 Applications would need to be amended to include the 2002 Application so the Town could study the cumulative impacts of both projects as required by SEQRA regulations. . . . [T]he failure to include the development proposed in the 2002 Application would constitute an improper and illegal segmented review of the related projects proposed in the 2005 Applications.").) Plaintiff disputes that any such amendment of the applications was offered to or discussed with Rugby's representatives by pointing to relevant deposition testimony from two Rugby representatives, Pine and Beil. (*See* Pl.'s Opp'n at 19-22.) However, there is an email

---

[15] To the extent plaintiff tries to argue that the 2002 Application and the 2005 Applications were submitted by two separate entities represented by different counsel, and that, as such, the projects were unrelated (*see* Pl.'s Opp'n at 22), that argument is unavailing. As a threshold matter, because, as noted *supra* and in the Court's September 28, 2012 Memorandum and Order, plaintiff admits in its 56.1 Statement that the 2005 Applications were submitted jointly by Rugby/Wulforst and plaintiff, plaintiff's argument that the 2002 and 2005 Applications were submitted by two unrelated entities is misguided. In

any event, even if the applications were submitted by two separate entities, that does not change the undisputed fact that both applications pertained to the same piece of land – the golf course parcel – and, as such, could be considered together for purposes of assessing the cumulative, environmental impacts of any proposed construction on that parcel of land under SEQRA. *See Sprint Spectrum*, 176 F.3d at 647 ("An agency making a SEQRA determination . . . may choose, in its discretion, to examine or not to examine the cumulative impact of separate applications within the same geographic area." (alteration, citation, and internal quotation marks omitted)).

in the record from Thomas to Rugby's counsel that belies any such dispute. In that email to Rugby's counsel, Thomas explained that the applications needed to be combined for purposes of SEQRA review:

> [I]t is my opinion that the special permit application of the Baiting Hollow club will have to be amended to include the Soundview project. Any SEQRA review would have to address both projects. I cannot segregate the SEQRA review. . . . Please let me know how you wish to proceed by the end of today.

(Siegel Decl. Ex. F.) This email serves as uncontroverted evidence that Rugby was given an opportunity to amend its 2005 Applications – an opportunity that it declined by never filing an amended application. Instead, plaintiff proceeded to withdraw its appeal so that defendants could move forward with their processing of the 2005 Applications.

Given that no rational jury could find that the 2002 and 2005 Applications should have been treated separately for purposes of SEQRA review, and given that the offer to amend suggested in the email was not acted upon, any subsequent discussions between defendants and Rugby's representatives about the need to discontinue the challenge to the Board's dismissal of the 2002 Application could not rationally be found to have been motivated by a desire on the part of defendants to infringe upon plaintiff's First Amendment activities, but rather to suggest the only other option for allowing the 2005 Applications to proceed without amendment. Said another way, no rational jury could find that any suggestion of appeal withdrawal, even if made by defendants, was motivated by plaintiff's exercise of a First Amendment right, for the

uncontroverted evidence demonstrates that any such discussion of withdrawing the appeal would have been offered as an alternative to the amendment option that Rugby's representatives declined to exercise. Accordingly, plaintiff has failed to establish the second element of its First Amendment claim.[16]

b. Third Prong: Harm to Plaintiff

Even if plaintiff could satisfy the first and second elements of its First Amendment claim, the claim would still fail because plaintiff cannot establish that defendants' actions resulted in harm to plaintiff. *See Gill v. Pidlypchak*, 389 F.3d 379, 383 (2d Cir. 2004) (explaining that a "plaintiff asserting

---

[16] Although the Court recognizes that "assessment[s] of individuals' motivations and state of mind" are "matters that call for a sparing use of the summary judgment device because of juries' special advantages over judges in this area," *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001), a plaintiff faced with a properly supported summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Here, defendants point to an email that undisputedly indicates that Rugby was given an opportunity to amend its applications and makes clear that any suggestion of withdrawal was offered merely as an alternative to that option (and not, as plaintiff suggests, as an attempt to infringe upon plaintiff's First Amendment rights). By contrast, plaintiff has failed to come forward with evidence sufficient to allow a reasonable jury to find in its favor – in light of the existence of the email – on this second prong of its First Amendment claim. Accordingly, the uncontroverted facts of this case warrant a grant of summary judgment in defendants' favor on the First Amendment claim based on plaintiff's failure to raise a genuine issue of material fact as to defendants' motivation. In any event, for the reasons discussed both *supra* and *infra*, summary judgment is also warranted in defendants' favor based on the fact that no rational jury could find for plaintiff on either of the other two elements of its First Amendment claim.

First Amendment retaliation must allege some sort of harm").

In *Gill*, the Second Circuit recognized the "possible inconsistency among [its] various sets of retaliation cases" in regard to the type of harm a plaintiff must demonstrate in order to prevail on a First Amendment retaliation claim. *Id.* at 384 n.5. Stating that "defendants are correct that a plaintiff asserting First Amendment retaliation must allege some sort of harm, but they are wrong that this harm must, in all cases, be a chilling of speech," the Second Circuit then proceeded to analyze how the type of harm that a plaintiff has been required to demonstrate in order to state a First Amendment retaliation claim depends on the context in which that claim was brought, *i.e.*, in the employment context, the prison context, and situations involving public official/private citizen retaliation claims. *Id.* at 383. The Second Circuit noted that "in certain cases involving public official/private citizen retaliation claims" – the context most applicable to this case – it has "seemingly not imposed a subjective chill requirement where some other harm is asserted." *Id.* As an example of such a case, the Circuit referenced *Gagliardi*, 18 F.3d 188, in which the plaintiffs' First Amendment retaliation claim survived a motion to dismiss because, in addition to demonstrating that their conduct was protected by the First Amendment and that the defendants' conduct was motivated by or substantially caused by the plaintiffs' exercise of speech, plaintiffs "adequately pleaded non-speech injuries – among other things, noise pollution." *Id.* (citing *Gagliardi*, 18 F.3d at 190). The Second Circuit revisited the issue a few years later, and noted that, in cases involving public official/private citizen retaliation claims, plaintiffs have generally "been required to show that they suffered an 'actual chill' in

their speech as a result," *Zherka v. Amicone*, 634 F.3d 642, 645 (2d Cir. 2011), but cited *Gill* and *Gagliardi* and acknowledged that, "in limited contexts, other forms of harm have been accepted in place of this 'actual chilling' requirement." *Id.*

Here, plaintiff points to alleged non-speech harms that it suffered as a result of defendants' actions. Plaintiff claims that because defendants would not move forward with the 2005 Applications while the 2002 Application remained in the picture, plaintiff had to withdraw its appeal to ensure that Rugby got approved for the Baiting Hollow Clubhouse proposed in the 2005 Applications. Plaintiff argues that it needed to ensure this approval because without it, Rugby might not have exercised on its option to purchase the golf course portion of plaintiff's property, thereby causing a loss to plaintiff of the $10 million that it stood to gain from the sale. However, the undisputed evidence is that Rugby's affirmative obligation to close on the option to purchase the golf course parcel arose from its failure to give plaintiff six months' notice to cancel the purchase. (*See* Rego Dep. at 229.) This means that, irrespective of whether or not the 2005 Applications were approved, Rugby was required to purchase plaintiff's property for $10 million. (*Id.* at 238-39 ("Q . . . If Rugby did not obtain approval to construct its clubhouse, do you believe Rugby still would have had an obligation to exercise the option to purchase the golf course property? A. Yes.") Indeed, plaintiff does not dispute that Rugby was required to close on its option due to the fact that it failed to give plaintiff the requisite six months' notice to cancel the purchase. Instead, plaintiff argues that "[s]imply because Rugby may have been required to close on the option does not necessarily mean they *would have* without the guarantee of approval of their new clubhouse." (Pl.'s

Opp'n at 24.) This argument is entirely misguided under principles of contract law – for once an event occurs that marks a party's acceptance of an option, in this case the passage of the available cancellation period, a binding contract is formed between the parties. *See, e.g.*, *United States v. 0.35 Acre of Land*, 706 F. Supp. 1064, 1072-73 (S.D.N.Y. 1988) (concluding that because the requisite notice required to constitute valid acceptance was provided within the option period, a binding contract was formed between the parties). Thus, upon the expiration of the permissible cancellation period, Rugby developed a contractual obligation to purchase plaintiff's property. Moreover, even if plaintiff's argument were sound under contract law, it is conclusory, at best, and entirely defeated by the undisputed fact that, despite the alleged improper actions of defendants, Rugby went forward with the sale and paid plaintiff the full $10 million it anticipated receiving from the sale.

Plaintiff additionally argues that, although Rugby ultimately exercised its option to purchase plaintiff's golf course property for $10 million, plaintiff lost the additional money it stood to gain from the spa (proposed in the 2002 Application) that it had planned to build on the seven-acre parcel, which the lease with Rugby expressly reserved for plaintiff. Plaintiff claims, therefore, that as a result of withdrawing the appeal, it lost an additional source of income. (*See* Pl.'s Opp'n at 23 ("But for the unlawful conduct on the part of the defendants which deprived the plaintiff of its health spa . . . the plaintiff could have sold the golf course parcel to Rugby for $10 million, as it did, *and* construct, operate and profit from the health spa, rather than be forced to abandon one to save the other.").) An insurmountable problem with this argument, however, is the level of speculation that it involves. Although plaintiff suggests that, as a result of being forced to abandon its appeal, it lost money that it would have otherwise derived from the spa, the truth of the matter is that such additional income was not guaranteed even if the appeal had persisted. This is because that additional income was contingent on, amongst other things, (1) a *successful* appeal (rather than the mere continuation or completion of the appeals process), as well as a favorable decision to plaintiff on remand,[17] and (2) plaintiff actually constructing the spa in the event that it was granted permission to do so. Given these variables, it is wholly speculative for plaintiff to suggest that it would have necessarily profited from a spa on the golf course parcel in the event that its appeal had not been withdrawn. Such a speculative theory of injury is insufficient to defeat summary judgment. *See Williams v. Town of Greensburgh*, 535 F.3d 71, 78 (2d Cir. 2008) (explaining that to prevail on First Amendment retaliation claims, plaintiffs "must prove that official conduct actually deprived them of [their free speech] right" by "com[ing] forward with evidence showing either that (1) defendants silenced [them] or (2) defendants' actions had some actual, non-speculative chilling effect on [their] speech" (citation and internal quotation marks omitted)); *see also Dorsett v. Cnty. of Nassau*, 11-CV-5748 (SJF)(GRB), 2013 U.S. Dist. LEXIS 9823, at *12 (E.D.N.Y. Jan. 24, 2013) ("[P]laintiffs have failed to allege, other than in a conclusory fashion, that defendants' conduct chilled the prospective exercise of

---

[17] As discussed at oral argument, the parties agree that if plaintiff succeeded on its appeal of the Article 78 proceeding based on the Board's denial of the 2002 Application, the case would have been remanded for reconsideration of the 2002 Application. (*See* Oral Arg. Mar. 8, 2013.)

their First Amendment rights."); *cf. Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (explaining that nonmoving parties may not rely on "unsubstantiated speculation" to defeat summary judgment).

Moreover, it is undisputed that, in addition to paying plaintiff $10 million for the golf course property, Rugby also granted plaintiff the right to collect rents from the original clubhouse for an additional 198 years. (*See* Rego. Dep. at 144-46.) This indicates that, although plaintiff claims that it was harmed as a result of defendants' conduct, plaintiff received the full $10 million it expected to gain from its sale to Rugby, as well as the additional right to collect additional money over the next 198 years. In opposing defendants' summary judgment motion, plaintiff argues that this extension on the right to collect rents that it received "should only serve to mitigate the plaintiff's damages, if anything, but does not mean that the plaintiff was not damaged by the actions of the defendants." (Pl.'s Opp'n at 23.) However, when asked how to quantify damages in this case, in light of the fact that we cannot know whether or not, on remand – that is, assuming plaintiff were successful on its appeal and the case were remanded for reconsideration of the 2002 Application – the 2002 Application for the spa would have been granted, plaintiff simply agreed that the question raises an interesting issue, and that it is something plaintiff would address at trial. (*See* Oral Arg. Mar. 8, 2013.)

For all of these reasons, it is clear that plaintiff has merely put forth a speculative theory of non-speech harm insufficient to defeat a motion for summary judgment. Based on the uncontroverted evidence in the record, no rational jury could find that plaintiff suffered any non-speculative, non-speech harms as a result of defendants'

actions and, accordingly, plaintiff has failed to establish the third element of its First Amendment claim.

To the extent that this is one of those cases where only an actual chilling of speech need be shown to constitute harm, plaintiff's showing is similarly deficient. As discussed *supra*, the email on December 13, 2006 from Thomas to Rugby's counsel serves as uncontroverted evidence that Rugby was offered an opportunity to amend the 2005 Applications to incorporate the spa proposed in plaintiff's 2002 Application. (*See* Siegel Decl. Ex. F.) Rugby's exercise of that option would have preserved plaintiff's right to appeal any later decision on the 2002 Application (as coupled with the 2005 Applications). Thus, it is clear that defendants' actions did not infringe on plaintiff's right of access to the courts, but instead, would have preserved that right for exercise at a later date had plaintiff not elected to instead withdraw its appeal. *See Williams*, 535 F.3d at 78 ("Because [plaintiff] cannot show that his speech was either silenced or chilled – *i.e.*, that his right to free speech was actually violated – [plaintiff's] claim fails as a matter of law."); *cf. Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("[A]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm . . . .").[18]

\*\*\*

---

[18] In any event, the uncontroverted evidence indicates that defendants did not cause the chilling of speech that plaintiff alleges occurred, for as discussed *supra*, any suggestion of withdrawing the appeal, if made, would have been offered as an alternative option to amending the 2005 Applications (to include the health spa proposed in the 2002 Application), and plaintiff's decision to exercise that option over amendment was a product of plaintiff's own volition.

In sum, because, for the reasons discussed above, no rational jury could find that plaintiff has made sufficient showings on any of the three requisite prongs of his First Amendment claim – as plaintiff cannot rationally establish from the evidence that (1) it has a constitutionally protected interest; (2) Ehlers' or Thomas' actions were motivated by a desire to infringe upon that interest; and (3) plaintiff was harmed as a result. Accordingly, summary judgment is warranted in defendants' favor on the First Amendment right to petition claim.[19]

## B. Qualified Immunity

Defendants Ehlers and Thomas also argue that they are entitled to qualified immunity with respect to plaintiff's First Amendment claim. Because, as discussed *supra*, the Court has concluded that no rational jury could find that plaintiff's constitutional rights were violated by the

individual defendants (or, indeed, that plaintiff even possessed a constitutionally protected interest in its appeal), the Court need not even reach the issue of qualified immunity. However, even assuming *arguendo* that there were disputed issues of fact as to whether a constitutionally protected interest existed and as to whether defendants Ehlers and Thomas violated that interest, the Court would find, for the reasons set forth below, that defendants Ehlers and Thomas are entitled to qualified immunity on the First Amendment claim.

"Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003). The Second Circuit has held that "a right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Luna v. Pico*, 356 F.3d 481, 490 (2d Cir. 2004) (quoting *Anderson v. Recore*, 317 F.3d 194, 197 (2d Cir. 2003)); *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999) ("A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right."). This analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (internal citations omitted). If there is no dispute as to the material facts,

---

[19] Finding no underlying constitutional violation to have been committed by defendants Ehlers and Thomas, the Court need not address the Town's liability under *Monell. See Segal v. City of N.Y.*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *see also Bernshtein v. City of N.Y.*, 496 F. App'x 140, 144 (2d Cir. 2012) ("To the extent that Bernshtein cannot establish Brockmann violated her constitutional rights (through false arrest, malicious prosecution, or excessive detention), the City of New York likewise is not liable on the *Monell* claims asserting those violations." (citations omitted)). Even assuming *arguendo* that the absence of an underlying constitutional violation did not preclude a *Monell* claim against the Town in this case, the Court concludes that the Town would still be entitled to summary judgment on that claim because of the absence of any evidence of an unconstitutional policy, practice, or custom by the Town, or a failure to supervise or train, as it relates to the issues in this case. Accordingly, summary judgment on the First Amendment claim is granted in both the Town's and the individual defendants' favor.

the issue of whether an official's conduct was objectively reasonable is an issue of law to be decided by the court. *Zellner*, 494 F.3d at 368; *see also Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir. 1995) ("If there is no dispute about the material facts, the district court should assess the reasonableness of the defendants' conduct under the circumstances presented in order to determine on summary judgment whether the defendants are entitled to qualified immunity.").

Here, even assuming that plaintiff possessed a constitutionally protected interest in its appeal and that defendants Ehlers and Thomas violated that interest by declining to process the 2005 Applications as submitted while the decision on the 2002 Application remained unresolved, the Court concludes that reasonable officials could disagree as to whether the actions taken by defendants Ehlers and Thomas violated plaintiff's rights under the First Amendment. In 1999, the Second Circuit discussed SEQRA and the review that it requires town planning boards to conduct prior to approving a proposed project for any parcel of land. *See Sprint Spectrum*, 176 F.3d at 645-48. The Second Circuit began its discussion by first emphasizing that town planning boards are "vested with considerable discretion in deciding whether to approve or reject a proposed project." *Id.* at 645 (explaining that a party does not possess an absolute right to the project they propose "simply because their construction constitutes a permitted use"). When it reached the issue of whether and when cumulative impact analyses must be conducted under the Act, the Second Circuit stated the following:

> An agency making a SEQRA determination is required to consider the cumulative impact of its action when applications are related, *see*
> *Save the Pine Bush, Inc. v. City of Albany*, 70 N.Y.2d 193, 205-06 (1987), and it "may choose, in its discretion, [to examine or] not to examine the cumulative impact of separate applications within the same geographic area." *Id.* at 205.

*Id.* at 647 (alteration in original). Thus, the Second Circuit has made clear that a cumulative impact analysis is required when assessing related applications, and agencies can exercise discretion in determining whether to assess a cumulative impact on unrelated applications proposed for the same parcel of land. As discussed *supra*, it is undisputed that both the 2002 Application and the 2005 Applications proposed construction projects on the same parcel of land – the golf course parcel. Thus, based on Second Circuit case law on the cumulative impact assessment issue in existence at the time, even if defendants Thomas and Ehlers were mistaken in concluding that the applications were related, thereby *requiring* a cumulative impact analysis under SEQRA, a reasonable person in their position could conclude that the decision whether or not to conduct such an assessment in this instance was *discretionary*, by virtue of the fact that the applications were for the same geographic area. Thus, because reasonable officials could disagree over whether it was a proper exercise of discretion to decline to move forward with the 2005 Applications as submitted – so as to consider the cumulative environmental impact of both sets of projects proposed for the golf course parcel – summary judgment is granted in favor of defendants Ehlers and Thomas on the issue of qualified immunity.

IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary

judgment in its entirety on the only remaining claim – namely, the First Amendment claim. Based upon this Memorandum and Order and the September 28, 2012 Memorandum and Order, the Clerk of the Court is directed to enter judgment in favor of defendants on all claims and close this case.

      SO ORDERED.


_____
JOSEPH F. BIANCO
United States District Judge


Dated: September 30, 2013
      Central Islip, NY


          * * *

Plaintiff is represented by David Antwork of Campanelli & Associates, 1757 Merrick Avenue, Suite 204, Merrick, N.Y. 11566. Defendants are represented by Daniel P. Barker and Frank A. Isler of Smith, Finkelstein, Lundberg, Isler & Yakaboski, LLP, 456 Griffing Avenue, Riverhead, N.Y. 11901.